THE STATE ex inf. L. L. COLLINS, Prosecuting Attorney of Pemiscot County, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY.

Division One, December 23, 1911.

1. **STATUTORY CONSTRUCTION: Penalty: Sec. 1075, R. S. 1899.** Section 1075, R. S. 1899, requiring railroad corporations to provide depots at their intersection at grade with other railroads, is purely penal and is to be strictly construed; i. e., it is not to be regarded as including anything that is not clearly and intelligibly described in the words of the statute, as well as manifestly intended by the Legislature.

2. ———: ———: ———: **Conditions: Judicial Notice.** The court will take judicial notice that there are conditions coming within the letter of Sec. 1075, R. S. 1899, that are clearly not within its spirit, and consequently not within its scope; e. g., that a railroad need not build a depot at every crossing where it enters a great railway terminal point.

3. ———: ———: ———: ———: ———: **Evils to be Corrected.** The court in construing Sec. 1075, R. S. 1899, takes judicial notice of the conditions in railway affairs to which it is to be applied, and which its remedial provisions are designed to correct.

4. **RAILROADS: Statutory Construction: Sec. 1075, R. S. 1899: Crossings: Other Roads.** Section 1075, R. S. 1899, does not require a railroad corporation to maintain a depot at each railroad crossing on its lines, but the duty is confined to the crossings of *other* railroads on which separate trains are run. In this

case appellant's east-and-west line was crossed at Pascola by a north-and-south spur, also owned by appellant, and the lines were there connected by a Y-track. Appellant maintained a depot at Pascola which was situated 400 feet from the crossing. During the time covered by this case there was no separate train service on the north-and-south spur, but a train running on the east-and-west line stopped each day at Pascola and turned aside to go on alternate days to one end of the spur and back before continuing its run eastward. *Held*, that the Pascola crossing was not such a crossing as was contemplated by Sec. 1075, R. S. 1899.

WOODSON, J., dissents from such language in the opinion as, in his judgment, indicates that the statute does not apply to railroads belonging to the same company.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley*, Judge.

REVERSED.

*W. F. Evans* and *E. T. Miller* and *Moses Whybark* for appellant.

(1) The court erred in overruling defendant's objection to the introduction of any evidence under the petition. The petition does not state facts sufficient to constitute a cause of action. Section 1075, which is a penal statute, applies only to the crossing or intersection of the lines of two railroad companies, not to the crossing or intersection of two lines of one railroad company. R. S. 1899, sec. 1075; R. S. 1899, sec. 1172; State ex rel. v. Railroad, 83 Mo. 144; State ex rel. v. Railroad, 105 Mo. App. 207; State ex inf. v. Tobacco Co., 177 Mo. 1; State v. Koock, 202 Mo. 223; State ex rel. v. Riley, 203 Mo. 175; State ex rel. v. Wilder, 206 Mo. 541; Lumber Co. v. Railroad, 216 Mo. 658; Mattison v. Hart, 14 C. B. 385. (2) Section 1075, under which this suit was brought, is a penal statute. State ex rel. v. Railroad, 105 Mo. App. 211; State to use v. Railroad, 83 Mo. 148.

*Ward & Collins* for respondent.

BROWN, C.—This is an action to recover the penalty prescribed in section 1075, Revised Statutes 1899, for an alleged violation of one of its provisions. The petition contained five hundred and six counts "consecutively covering each day from the first day of July, 1904, to the seventeenth day of November, 1905. Except as to the day charged, they are identical. Only the first count is set out, and the record is silent as to where the material for another count was obtained after the five hundred and five days of the period named had been utilized. Judgment was given for twenty-five dollars on each of the five hundred and six counts, aggregating the sum of twelve thousand six hundred and fifty dollars.

The first count of the petition, omitting formal parts, states that the defendant, a railroad corporation, "was on the 1st day of July, 1904, engaged in the transportation, for hire, of passengers and property on its line of railroad running from the city of Caruthersville, in Pemiscot county, Missouri, through said county to the city of Kennett, in Dunklin county, Missouri, and on its line of railroad running from the town of Deering, through said Pemiscot county, Missouri, to the town of Wardell, in Pemiscot county, Missouri; that the two said lines of railroad cross and intersect each other at the town of Pascola, in Pemiscot county, Missouri; that said defendant was on the 1st day of July, 1904, operating, managing, running both of said lines of railroad and engaged in the transportation of passengers and property on both of said lines of railroad; that the two said lines of railroad where they intersect and cross each other at said town of Pascola, Missouri, were and are upon the same grade; that the character of the land at such crossing, intersection and junction of the two said lines of railroad at the places aforesaid will now and would on

the 1st day of July, 1904, admit of erection, building and maintaining of a depot, or passenger house or waiting room or rooms sufficient to comfortably accommodate all passengers awaiting the arrival and departure of trains at such junction, intersection and crossing of the railroads aforesaid; and that the defendant on the date aforesaid failed, neglected and refused to build and maintain at said junction, railroad crossing and intersection of the two lines of railroad as aforesaid at Pascola, Pemiscot county, Missouri, as aforesaid, as a railroad corporation and company engaged in the transportation of passengers and property over the said line of railroad running from the city of Caruthersville, Missouri, to the said city of Kennett, Missouri, or as a railroad corporation and company engaged in the transportation of passengers and property over the said railroad running from Deering, Missouri to Wardell, Missouri, either jointly or separately for said lines of railroad, a depot, passenger house and waiting room or rooms sufficient to comfortably accommodate all passengers awaiting the arrival and departure of trains at such junction, railroad crossing and intersection aforesaid of the two lines of railroad aforesaid at Pascola, Pemiscot county, Missouri.''

The facts so stated were put in issue by proper pleading, and at the trial the defendant objected to the introduction of any evidence, on the ground that the petition did not state facts sufficient to constitute a cause of action. This objection was overruled by the court, and defendant excepted. The trial then proceeded and the following facts were developed and remain undisputed:

The defendant railroad company, on and before July 1, 1904, had a line of railroad called in the evidence the Caruthersville branch, extending from a junction at Kennett in Dunklin county, easterly about fourteen miles to Pascola, in Pemiscot county, where

the scene of this suit is laid, thence east about five miles to Hayti, a junction, thence easterly about seven miles to Caruthersville. In the spring of 1903 a branch had been constructed from the little village of Pascola in a southerly direction about six miles to Deering, where there was a mill or two for the manufacture of lumber, and in the fall of that year this line was extended so as to cross the Caruthersville branch at grade about four hundred feet west of its Pascola station, and run north about six miles to Wardell, where there was also a lumber mill. From each end of this line spurs extended to similar industries. The excuse for this construction seems to have been the carriage of logs and sawed lumber, and such traffic as might be incident to such industries. During the time involved in this inquiry there has been no separate train service on the line between Deering and Wardell, but the freight and passenger business was done by a mixed train which ran between Kennett and Hayti. At first it carried a combination baggage and passenger car. This did not prove strong enough to stand the usage it received and a caboose was substituted. Sometimes the passengers had to be content with a box car, or even a flat car. The junction of the two branches was effected by a Y-track occupying the southwestern of the four angles formed by the crossing, connecting with the line running in the direction of Kennett about thirteen hundred feet westerly from the crossing, and with the line running to Deering about the same distance in a southerly direction. The depot was on the line extending toward Hayti, about four hundred feet easterly from the crossing. It has, since the beginning of this suit, been moved to the crossing. From four to six passenger trains per day passed Pascola on the line between Kennett and Caruthersville. There is no depot building on the Wardell-Deering line other than that at Pascola.

238 Sup.—39

During the time covered by this suit there seems to have been no daily train service, either to Deering or Wardell. There was, during the most of that time, tri-weekly service, operated about as follows: The Hayti local freight would leave Kennett in the morning; proceed to Pascola; do its local work at that station; leave its train, except the Deering cars, on the side track; back up with the Deering cars to the west connection of the Y, and head to Deering. Having done its work there it would back out to the main line over the same course on which it headed in, pick up its train from the side track at Pascola, and proceed to Hayti. It would there pick up its return train, and head through to Hayti. The next day the same train stopped at Pascola, and its engine and crew did the Wardell business in the same manner that they had done the Deering business on the previous day, except that when it had finished its local business at Pascola, and had headed in on the Y to the Deering track, it backed over the crossing which seems to be the bone of contention in this case, stopping at that point to take passengers, and then backed on to Wardell, heading back to the Y.

As to the running of these trains, W. D. Bracey, a witness for plaintiff, testified: ''The train generally runs from Pascola to Deering one day and from Pascola to Wardell the next. They don't have time to make the round trip in one day. If they were going up to Wardell or down below they would stop at the station, and stop as they came back. If they were going to Wardell they would stop where the station is now as they went west and take on passengers. Once in a while, when they would make a trip from Hayti and they would be going to Deering, the passengers would get on at the old depot and they would go on to Deering. I don't remember whether they ever made a straight through trip from Deering to Wardell and back to Pascola since July 1, 1904.''

Sam Skinner, for plaintiff, testified: "In going to Wardell they would not take passengers on at the depot; they took them on at the crossing; and if they were going to Deering they would take them on at the crossing. Sometimes going to Deering they would get on at the depot, and sometimes they would get on at the crossing, but in going to Wardell they would get on at the crossing all the time."

Mr. J. H. Powell, for respondent, said: "People going from Pascola to Wardell got on the train everywhere, they got on at the crossing. . . There is lots of time they would go down to Deering, and of course the passengers would get on at this depot, and sometimes they would back up to the crossing, and they would come down and get on at the crossing."

Squire A. Russell, for plaintiff, testified that he had seen passengers at Pascola come out to the crossing and wait when the local was coming around the Y.

The plaintiff also introduced evidence tending to show that the land at the crossing was suitable for a depot building, and that the depot building had in fact been moved to that place at the time of the trial, but no attempt was made to show the character of the site at either of the junctions of the Y, which constituted the only connection between the two lines.

The court found that the defendant's trains on the Deering-Wardell line made regular stops at the crossing and that a depot or passenger house at that point "would have been of great public utility, comfort and benefit to all passengers traveling over both of said lines of railroad."

## OPINION.

The primary question in this case is whether or not, upon the undisputed facts, the defendant was guilty of the violation charged in the petition of a penal provision of section 1075, Revised Statutes 1899, by maintaining its only "depot or passenger

house and waiting room" at its station of Pascola at a point about four hundred feet from a crossing of two of its tracks within the limits of the village, instead of maintaining it, or establishing another depot, at some point nearer to physical contact with the crossing.

The statute under which this suit is prosecuted, and by which it must be judged, provides that every railroad corporation engaged in the transportation of passengers or property, "shall, at all crossings and intersections of other railroads, where such other railroad and the railroad crossing the same are now or may hereafter be made upon the same grade, and the character of the land at such crossing or intersection will admit of the same, erect, build and maintain, either jointly with the railroad company whose road is crossed, or separately by each railroad company, a depot or passenger house and waiting room."

The remedy provided for disobedience of this statutory mandate is not a compensatory one, by which a private injury is assumed and the recovery inures wholly or in part to the person or persons presumed to have been injured. Each day during which the command is disobeyed carries with it its forfeiture to the public, equal in amount, although there may have been no one affected by such disobedience, or who could have received any benefit from obedience. The provision is purely penal, and is to be strictly construed. [State to use v. Railroad, 83 Mo. 144.] This means that it is not to be regarded as including anything not within its letter as well as its spirit; which is not clearly and intelligibly described in the words of the statute, as well as manifestly intended by the Legislature. [Endlich on the Interpretation of Statutes, section 329.] And as words are merely symbolic of the things or conditions which call for their use, and to which they are applied, those things and conditions necessarily constitute the foundation of statutory construction.

Even the modest repertoire of common knowledge which courts are permitted to have and use disguised under the name of judicial cognizance, informs us that there are many conditions coming within the letter of this enactment that are clearly not within its spirit, and consequently not within its scope. It may be that while on its way to a common passenger terminal, as in St. Louis, a road may cross line after line under the protection of interlocking switches and signals, its trains stopping at the single station provided for a general interchange of traffic. In such case, and many others that could be mentioned, the maintenance of depots and waiting rooms at all the crossings, while they might possibly accommodate some belated traveler striving to make a connection for which there would not be time to go into the union depot, or some denizen of the region immediately adjacent to the crossing, would retard the movement of traffic, and tend to defeat the great object which is sought to be attained in the development of this kind of transportation. In State v. Railroad, 32 Fed. 722, 724, the late Justice BREWER, referring to this same statute said: "It was suggested on the argument that in some instances the tracks of two railroads cross and recross several times within the limits of a city in making their way to a union depot; and it was asked, Why should a depot be required at each of those crossings? It may be that, under the statute, none is there required; for it has been often said that that which is not within the spirit, though within the letter, of the statute, is not within the statute, and it may well be that, construing this statute according to its spirit, it does not apply to cases of that kind. It may also be true that other circumstances may exist which in any given case will prevent the operation of the statute. This very case may, when the facts are fully disclosed, show a condition of affairs which will justify the court in holding the statute inapplicable."

As we have already suggested, an important element in the construction of this and other statutes is the consideration of the conditions to which it is to be applied, and which its remedial provisions are designed to correct. It is a matter of public notoriety that at the time of the enactment of this section there was an impression so general that it had begun to receive frequent legislative expression, that the railroad corporations did not come with alacrity to the performance of the duties to the public growing out of the nature of their franchises. It was asserted, among many other grounds of complaint, that they sought to exclude their patrons from the benefit they might otherwise obtain from lines which they had been permitted by law to cross, by refusing to afford facilities for interchange of freight and passenger business, or even to stop at such intersections. The effect of this policy is illustrated in Jacobson v. Railroad, 71 Minn. 519. In that case the Willmar and Sioux Falls Railroad extended from Willmar, Minnesota, southwesterly to Sioux Falls, South Dakota, and was crossed at nearly right angles near Hanley Falls, Minnesota, by the Wisconsin, Minnesota & Pacific Railroad on its way from Minneapolis to Watertown, South Dakota. The Willmar road belongs to the Great Northern system which passes through large areas of timber available for fuel and fenceposts. The Wisconsin line occupies a prairie country, involving a long haul over its line for fuel and posts, while much cheaper timber could be furnished for both purposes to the people along its line by connecting with the Willmar line at Hanley. The prairie country also furnished a considerable supply of cattle, of which the stockers and feeders found the market at Sioux City and through Sioux City to Omaha. If these cattle should be delivered to the Willmar at Hanley Falls it could take them to Sioux City with a haul of 181 miles, while by the Wisconsin line the haul was 380 miles, much of it directly away from

the destination of the traffic. With cheap fencing and fuel and easy transportation for their stock at their doors, these people along the Wisconsin line were as effectually shut off from these advantages as if they had never existed, by the refusal of the road built to serve them, to make this connection until compelled by the enforcement, in the case cited, of a statute much like our own. Instances of this kind, affecting the carriage of both persons and property, became common, and the courts being slow to grant relief through the exercise of what many asserted to be their inherent jurisdiction, some of the State Legislatures came into the game, and by the enactment of laws similar in principle to the one now under consideration, sought to make these facilities real aids in the healthy development of the communities through which they extended rather than instruments of commercial isolation and the suppression of competition.

These observations with reference to the spirit which gave this statute birth and life, and the conditions to which it was intended to apply, lead us naturally to the question whether or not either or any of the tracks of the defendant at the Pascola crossing were, in relation to its other track or tracks at that place, another railroad within the meaning of this law during the time covered by the charges contained in the petition. The mandate is addressed to the "railroad corporation." Its line of road is not, in this connection, mentioned or distinguished, so that the "corporation," in the language of the statute, stands for the railroad which it owns. It is not commanded to build and maintain a depot at each railroad crossing on its line or lines, but the duty is confined to the crossings of *other* railroads; and the requirement to construct and maintain the depot or depots assumes a separate ownership of each line of track affected. These provisions at the very least assume that they refer to two roads, on each of which separate trains

are run, and that their object is to provide for a connection between such trains, and the convenient and comfortable transfer of traffic.

In this case there was no separate operation of two lines, nor was any separate train run on the track between Deering and Wardell. There was not even a depot building at either extremity or at any other place on it than Pascola. During the entire time covered by the petition the local train from Kennett to Hayti, which necessarily ran past the Pascola depot, stopped at that depot, did its local work, and set out its cars on the side track, except the caboose and those going to Deering or Wardell as the case might be. If it was the Deering day the passengers for that place usually got on at the depot, the train backed over the crossing and about a quarter of a mile beyond to the Y connection, and then headed over the Y to Deering. When it came back with the cars from Deering it backed up to and over the Y to the main track, headed to the depot, discharged its passengers, picked up the cars it had left and the passengers for the east, and went on to Hayti. If it was the Wardell day the same course was pursued until the train with the Wardell cars reached the line running toward Deering. It then backed to the crossing, took on its passengers that had not got on at the depot before starting and such packages as were there for that purpose, and backed on to Wardell. It then headed back to Pascola, switched around the Y to the main track, picked up its cars and passengers for the east and went on to Hayti. Sometimes passengers for Wardell would get on at the depot, but not often. If they did they would of course have to ride round the Y, nearly a mile, and come back to within about four hundred feet of their starting place. To avoid this, they walked down to the crossing, in time to take the train which stopped for them at that point.

Under these circumstances, the ownership being identical, and the Deering-Wardell trackage being operated as two spurs, forming a part of the Kennett-Caruthersville line, and with the train running on that line, the Pascola crossing was not during the time covered by this suit such a crossing as was contemplated by the statute under which this suit was instituted. The judgment of the circuit court is accordingly reversed. *Blair, C.,* concurs.

PER CURIAM.—The foregoing opinion by BROWN, C., is adopted as the opinion of the court. All concur. WOODSON, J., concurs in result only, and dissents from such language in the opinion as in his judgment indicates that the statute does not apply to railroads belonging to the same company.