THE STATE ex rel. M. LUTHER SPRIGGS v. E. F. ROBINSON et al., Comprising State Board of Health.

Division Two, December 9, 1913.

1. PHYSICIAN: License to Practice: Valuable Right. The license of a physician to practice medicine or surgery is a valuable privilege—perhaps a property right, when once duly issued according to law.

2. ————: Revocation of License: Penal Statute. A statute which authorizes the State Board of Health to revoke the license of a physician to practice medicine, is highly penal, and no one can be held to have violated its provisions unless his acts come within its letter and spirit.

3. ————: ————: Advertisement. The license of a physician to practice medicine and surgery cannot be revoked for an advertisement in a newspaper announcing his "practice limited

to diseases of women and surgery," and mentioning that he has an "office and private hospital."

4. ————: ————: **Hearsay Testimony: Reputation.** Nor can it be revoked upon the testimony of another physician that several physicians had told him accused bore the reputation of a criminal abortionist. Nor should such testimony be considered or admitted by the State Board of Health in determining whether his license is to be revoked, since it is mere hearsay.

5. ————: ————: **Willingness to Commit Criminal Abortion: Expressed in Letters: Living Foetus.** The fact that the State Board of Health, after a hearing, revoked relator's license to practice medicine and surgery, for having offered, or been willing, to commit criminal abortion, is taken, in this suit to annul the action of said board, to mean that the symptons and conditions narrated in letters written to him by a post office inspector who impersonated and used the name of a fictitious woman, and his replies thereto, ·unmistakably pointed to a living foetus, which it would have been a crime to remove or destroy.

6. ————: ————: **Specified Acts: Ejusdem Generis.** Where a law specifically designates several matters or things which shall be governed by its provisions, and then by general language undertakes to include other acts and things not specifically designated, it must be construed to apply only to things and acts of the same general nature as those specified.

7. ————: ————: ————: **Desire or Willingness to Commit Abortion.** A statute in reference to physicians declaring that the State Board of Health may revoke the license of "persons guilty of unprofessional or dishonorable conduct," and that "habitual drunkenness, drug habit or excessive use of narcotics, or producing criminal abortion, or soliciting patronage by agents, shall be deemed unprofessional and dishonorable conduct within the meaning of this action, but these specifications are not intended to exclude all other acts for which licenses may be revoked," designates only acts, and does not penalize mere desires or willingness to do any of those acts, nor does the general language of the last clause penalize a mere offer to commit criminal abortion. The statute does not authorize the board to revoke the license of a physician who at most did nothing worse than express in letters a willingness to commit criminal abortion upon a fictitious young woman, and designating his "professional fee."

8. ————: **Unprofessional Conduct: Legislative Power of Board.** The law does not give the State Board of Health the power to determine what shall constitute dishonorable and

unprofessional conduct; nor is there perceptible any good reason why a statute should not designate the numerous acts and things which would constitute such conduct—for instance, why the statute should not expressly designate an offer to commit a criminal abortion, if it was the legislative intention that such offer should be considered as unprofessional and dishonorable conduct.

Appeal from St. Louis City Circuit Court.—*Hon. G. C. Hitchcock*, Judge.

REVERSED.

*W. T. Nardin, Howard Gray* and *McReynolds & Halliburton* for relator.

(1) The court erred in holding that the evidence tended to prove that the relator was willing to commit a criminal abortion on the person of Susie Davis for one hundred dollars or any other sum. There is absolutely no evidence to show what medical conclusions might be drawn from the letters to the physician. In all of the cases of this character which have been passed on by the courts, the rule has been laid down that the complainants must allege and prove that the offense which is the basis of the complaint, is one which is in violation of the statute. Board v. Eisen, 123 Pac. 52; McComer v. Board of Health, 65 Atl. 263, 8 L. R. A. (N. S.) 58; State ex rel. v. Kellogg, 36 Pac. (Mont.) 957. (2) The rule of common law was that a man could not be convicted of an offense which he had been tempted or lured to commit. That rule has been adopted in this State with this modification, that where the conspirator inducing the commission of the crime was a party to that commission, there could be no conviction. That rule is firmly established in the jurisprudence of this State and applies fairly to the facts in this case because all of the poison in the correspondence is to be found in the letters written by

the post office inspector. Without those letters the letters of the relator mean nothing. Letters of the inspector show persistent and determined effort on his part to induce the violation of the statute for which he was seeking to punish the relator. State v. Hays, 105 Mo. 76; State v. Waghalter, 177 Mo. 676; Wilcox v. People, 67 Pac. 343; Connor v. People, 33 Pac. 159; Speiden v. State, 3 Tex. Ct. App. 156, 30 Am. Rep. 126; United States v. Matthews, 35 Fed. 890; United States v. Adams, 59 Fed. 674; State v. Jansen, 22 Kan. 498. The Federal courts, apparently in a desire to assist their postoffice inspectors, have announced a different doctrine with reference to decoy letters, assigning as a reason that the act of the inspector is prompted not so much by a desire to induce the crime as to ascertain whether the defendant is engaged in an unlawful business. Grim v. United States, 156 U. S. 610. In other words, the Federal statute was leveled at a certain class of business which was being prosecuted largely through the mail and the purpose of the law was to give the Federal authorities control of the use of the mails. With this in view consider for a moment the situation in this case. The record here shows a trap, instigated by competitors, to catch a skillful and capable surgeon, a man whose reputation was up to that time untarnished, and who undoubtedly was not engaged in prosecuting any business through the mails and certainly not that of which he is here accused. More than that, the record shows that the very crime which it was sought to induce him to commit was not, in the very nature of things, susceptible of commission. There was no such person as Susie Davis. She is a mere figment in the inspector's imagination. Her condition was born of his information of what it would take to create a condition necessary for a criminal operation. Where the crime cannot be committed there is no offense under the law. Tarver v. State, 43 Ala. 354;

State v. Clarissa, 11 Ala. 57; Sipple v. State, 46 N. J. L. 197; Commonwealth v. Parker, 9 Metc. 263; State v. Cooper, 2 Yab. 53; Smith v. State, 33 Me. 48. (3) The relator contends that Sec. 8317, R. S. 1909, has expressly defined the words "unprofessional and dishonorable conduct" and having defined them it does not lie within the power or authority of the State Board of Health to extend or enlarge that definition. The latter part of the clause does not undertake to broaden the definition of "unprofessional or dishonorable conduct." Those two terms are expressly defined by the Legislature. What the statute does, is simply. to say that there may be other acts for which a license may be revoked. Such a statute is highly penal and should be strictly construed. The right to practice is a valuable property right and cannot be taken away from a citizen without due process of law. Hewitt v. Examiners, 84 Pac. 39; State ex rel. v. McElhinney, 241 Mo. 592; Cummings v. Missouri, 4 Wall. 277; Comm'rs v. Jones, 10 Bush. (Ky.) 731; In re Dorsey, 7 Port. (Ala.) .293; Baker v. People, 3 Con. (N. Y.) 686.     (4) The relator contends that there can be no general grant of authority to revoke licenses for unprofessional and dishonorable conduct without defining these terms or for "other acts which are not included in the specifications of the statute" because such an authority is too vague, indefinite, and uncertain to give those effected any information. as to what was lawful or unlawful under the terms of the act. Matthews v. Murphy, 54 L. R. A. 415; Ex parte McNulty, 77 Cal. 164; Hewitt v. Examiners, 84 Pac. 39; Kennedy v. State Board, 108. N. W. 730; Czarra v. Board, 25 App. D. C. 443; Ex parte Jackson, 45 Ark. 164; State ex rel. v. Purl, 228 Mo. 1.     (5) The definition appearing in the statute could only be extended by the well-known rule of *ejusdem generis*. Black on Interpretation of Laws (Hornbook Series), sec. 63, p. 141; Endlich on Interpretation of Statutes,

secs. 405 to 411, p. 567; State ex rel. v. Purl, 228 Mo. 1; State ex rel. v. Berryman, 142 Mo. App. 373; St. Louis v. Kaime, 180 Mo. 309; Ruschenberg v. Railroad, 161 Mo. 70; State v. Butler, 178 Mo. 272; 1 Dillon on Mun. Corps. (4 Ed.), secs. 392, 393.

*John T. Barker,* Attorney-General, and *W. T. Rutherford,* Assistant Attorney-General, for respondents

(1) That relator was induced by a United States post office inspector or other persons to agree to perform a criminal abortion will not excuse him in a proceeding to revoke his license for unprofessional or dishonorable conduct. State v. Hayes, 105 Mo. 76; State v. Waghalter, 177 Mo. 676; Spurgeon v. Rhodes, 167 Ind. 9; 1 Bishop's New Crim. Law, secs. 258-262; State v. Oliphant, 128 Mo. App. 264. (2) Sec. 8317, R. S. 1909, includes acts other than those specifically named in the statute as unprofessional and dishonorable conduct. See authorities cited under point 3; Meffert v. Packer, 1 L. R. A. (N. S.) (Kan.) 814, 195 U. S. 625; State ex rel. v. Goodier, 195 Mo. 556; Spurgeon v. Rhodes, 167 Ind. 11; People v. Apfelbaum, 251 Ill. 22; Wolf v. State Bd. Med. Ex., 109 Minn. 360; State v. Board, 32 Minn. 324; State v. Board, 34 Minn. 387; Board of Health v. McCoy, 125 Ill. 289; Board of Health v. Roy, 48 Atl. 802; Morse v. Board Med. Ex., 122 S. W. (Tex.) 446; Berry v. State, 135 S. W. (Tex.) 632; In re Smith, 10 Wend. 449; State ex rel. v. Hathaway, 103 Mo. 29. (3) Section 8317, is not invalid or unconstitutional in granting power to the State Board of Health to revoke a license to practice medicine for unprofessional or dishonorable conduct. People v. Apfelbaum, 251 Ill. 22; Berry v. State, 135 S. W. 1; Oil Co. v. State, 48 Tex. Civ. App. 179; Morse v. Board of Med. Ex., 122 S. W. (Tex.) 448. (4) A license is not a contract. State v. Gazlay, 5

Ohio, 22; Cohen v. Wright, 22 Cal. 317; Ex parte Yale, 24 Cal. 242; Lanquille v. State, 4 Tex. App. 320; Simmons v. State, 12 Mo. 279; State ex rel. v. McIntosh, 205 Mo. 636.  (5)  Section 8317 is not void for uncertainty and unconstitutional, because it authorizes the State Board of Health to revoke a license to practice medicine for unprofessional or dishonorable conduct, and leaving it to the board to determine what shall constitute such conduct, separate and apart from the specific acts mentioned in the statute.  People v. Apfelbaum, 251 Ill. 22; Berry v. State, 135 S. W. 631; Morse v. Bd. Med. Ex., 122 S. W. 448; Spurgeon v. Rhodes, 167 Ind. 11; Wolf v. Bd. Med. Ex., 109 Minn. 360; Oil Co. v. State, 48 Tex. Civ. App. 179.  (6) The Board of Health may revoke a license for the same cause that it might refuse a license.  The right to practice medicine is a privilege granted by the sovereign.  It is not a vested right free from regulation. State ex rel. v. Burroughs, 41 L. R. A. (Ind.) 217; Reetz v. Michigan, 188 U. S. 505; Hawker v. New York, 170 U. S. 189; Dent v. West Virginia, 129 U. S. 114; Meffert v. Packer, 1 L. R. A. (N. S.) 815, 195 U. S. 625; Bradwell v. Illinois, 16 Wall. 130; In re Lockwood, 154 U. S. 116; In re Smith, 10 Wend. 449; People v. Hulda, 52 Hun, 65; Traer v. Bd. Med. Ex., 106 Iowa, 559; State ex rel. v. Goodier, 195 Mo. 558; State ex rel. v. McIntosh, 205 Mo. 637; Sec. 8317, R. S. 1909.  (7)  Statutes enumerating grounds for the revocation of physicians' licenses are not *ex post facto* laws; and therefore such licenses may be revoked for acts that were not grounds for revocation at the time they were committed, but were afterwards made so by statute.  Meffert v. Bd. Med. Ex., 1 L. R. A. (N. S.) 818, 195 U. S. 625; Board of Health v. Roy, 22 R. I. 538; State v. Schaffer, 129 Wis. 465.  (8)  An agreement to commit an abortion is, in common judgment, unprofessional and dishonorable conduct, and, therefore, cause for the revocation of relator's license

to practice medicine. Spurgeon v. Rhodes, 167 Ind. 8. (9) The Board of Health may revoke a license for the same cause that it may refuse a license. Sec. 8317, R. S. 1909; State ex rel. v. Goodier, 195 Mo. 560; Meffert v. Bd. Med. Ex., 1 L. R. A. (N. S.) 816, 195 U. S. 625; People v. Apfelbaum, 251 Ill. 25. (10) The findings of a medical board in a proceeding to revoke a physician's license are conclusive upon the courts. 30 Cyc. 1557; Meffert v. Bd. Med. Ex., 1 L. R. A. (N. S.) 816, 195 U. S. 625; Munk v. Frink, 116 N. W. (Neb.) 528. (11) The practice in revocation proceedings before a medical board being more flexible than that allowable in the courts, evidence which tends to prove or disprove the point in issue may be introduced, although not the best evidence which might be had. 30 Cyc. 1557; Traer v. Bd. Med. Ex., 106 Iowa, 559; State ex rel. v. Goodier, 195 Mo. 559; State ex rel. v. Chittenden, 112 Wis. 569. (12) The rule of *ejusdem generis* cannot be invoked when the plain intent of the Legislature is to the contrary, or would defeat the evident purpose of the law. State v. Smith, 233 Mo. 257; 36 Cyc. 1120-1121, notes 42 and 43; Henderson v. Railroad, 81 Mo. 607; 2 Lewis' Sutherland on Stat. Const. (2 Ed.), secs. 363, 364 and 437; Grimes v. Reynolds, 184 Mo. 698.

BROWN, P. J.—Appeal from the judgment of the circuit court of St. Louis City sustaining the action of the State Board of Health in suspending the appellant from the practice of medicine and surgery in this State for a period of one year.

The charge upon which appellant was suspended is that he was guilty of "unprofessional and dishonorable conduct," in that he offered, or was willing, to commit a criminal abortion.

Prior to October 19, 1912, appellant was engaged in the practice of medicine and surgery at Joplin, Missouri, and the evidence upon which he was suspended

from practice is mostly documentary, and is as follows:

First: The following advertisement inserted by appellant in a newspaper at Joplin:

### DR. M. LUTHER SPRIGGS.

Practice limited to diseases of women and surgery. Office and private hospital, 417 S. Cox avenue. Consultation hours, 9 to 12 a. m., 2 to 4 p. m. Home phone 411, Bell phone 517. Residence, The Connor.

After this advertisement appeared, a post office inspector caused certain letters to be written and mailed to appellant from Galena, Missouri, to which letters was affixed the name "Susie Davis." Said letters and the appellant's replies thereto are as follows:

"Galena, Mo., May 10, 1912.

"Doctor M. Luther Spriggs.

"Dear Sir: I cut the enclosed from a Joplin Globe of last Sunday, and wish to write you, as I was about to go to Kansas City or somewhere away from here. I am not married and was indiscreet to allow my beau liberties which I should not have done. The worst of it is, I am caught, I fear, and in a family way. I missed just twice. I ought to be sick the 14th of this month but I don't know whether I will or not. I have taken all kinds of medicine without avail. I am scared every day of discovery and believe I am getting larger.

"Please let me know if you will take it away and how much it will cost. I ask no charity as I have some money and I know the young man the cause of the trouble will furnish more, if needed. We can pay you well between us. Please destroy this letter.        Yours truly,

"SUSIE DAVIS,

"Galena, Mo."

"Joplin, Mo., May 11, 1912.

"Replying to yours of the 10th inst., allow me to say that you should come here at the earliest possible moment At that time we can go fully into all of the details.

"Very truly yours,

"M. LUTHER SPRIGGS."

State ex rel. v. Robinson.

"Galena, Mo., May 21, 1912.

"Doctor M. Luther Spriggs.

"Dear Sir: Replying to your letter in regard to my coming to Joplin for operation, I would ask what the approximate cost will be. I do not want to make the trip to Joplin without enough money to have the work done. I can get the money easier now than I can get it after I get there. I can leave here as soon as I hear from you.

"Yours truly,

"SUSIE DAVIS,

"Galena, Mo."

"Joplin, Mo., May 22, 1912.

"Dear Miss Davis:

"Will say in reply to yours of the 21st inst., that your bill with me will be approximately $125 and your living expenses will have to be met for something like a week or possibly ten days.

"It seems to me that $150 should be ample to take care of everything.

"Remember that it is important to act as promptly as possible.                    Very truly yours,

"M. LUTHER SPRIGGS."

"Galena, Missouri.

"Dr. M. Luther Spriggs.

"Dear Sir: Replying to your favor of the 22nd inst., I had no idea the price for relieving one in a family way was over $25 to $50. While I can get more than this, I much fear that I cannot raise the amount you mentioned, and unless you can do some better for me, I must make other arrangements. I can raise $100. Please write me without delay what you will do.                    Yours truly,

"SUSIE DAVIS,

'Galena, Mo.

"May 26, 1912."

"Joplin, Mo., May 26, 1912.

"Dear Miss Davis:

"Replying to yours of today allow me to say that we do not ordinarily make any concessions in such matters. However, I am willing under the circumstances, to allow you the reduction you speak of, viz.: $100 professional fee. You will of course have to defray your living expenses for a week or ten days, which will be moderate, and I will be glad to assist you to make arrangements in this way that will be satisfactory.

"Hoping this will meet with your approval.

"Very truly yours,

"M. LUTHER SPRIGGS."

State ex rel. v. Robinson.

"Galena, Mo., May 30, 1912.
"Dr. M. Luther Spriggs.
    "Dear Sir:    Replying to your letter of the 26th inst.,
I thank you for the concession you have made, but since my
last letter, I have come unwell a little.  Do. you think I could
be pregnant under the circumstances?  I have missed a week
or two before but never anything like this.  Could my worry-
ing over this matter have kept off my monthly sickness?
However, the flow is not like it usually is and there is some
pain which is not usual with me.  Do you think I should still
come to Joplin and have the work done?  I can come if you
think it possible that I am in a family way and that I should
come under the circumstances.
    "Thanking you for your prompt attention to this matter
for me, I am,                     Yours very truly,
                                          "Susie Davis."

                                          "Joplin, Mo.
"Dear Miss Davis:
    "Replying to yours of the 30th inst., will say that you
should not be confused by the appearance of a discharge.  By
all means do not delay your coming as we are losing valuable
time.   There is no doubt whatever in my mind in regard to
the actual condition.  However, when I examine you 'I will
be in a position to tell you definitely all about the details.
It is not uncommon for women to have a menstrual dis-
charge, which originates from the cervix, in a condition such
as yours and they are sometimes deceived by it.  You may
be quite positive that worry and anxiety would never cause
a delay such as yours.  I cannot impress too forcibly on
your mind' the absolute necessity of prompt action.  Assuring
you of my best wishes and hoping to see you soon; very truly,
                              "M. Luther Spriggs,"
    "May 30, 1912."

The complaint was signed by three physicians of
Joplin, Missouri who describe themselves as the
"Board of Censors of Jasper .County Medical So-
ciety."  Neither of those physicians testified at the
trial.

The secretary of the State Board of Health testi-
fied that several physicians of Joplin, Missouri, had
told him that appellant had the reputation of being a
criminal abortionist.

Four physicians residing at Joplin, Missouri, and
two residing at Galena, Missouri, testified that ap-

pellant had been practicing medicine in Joplin for about ten years; that they were quite intimately acquainted with him, and that his reputation was of the very best. They also testified that he was a very skillful surgeon; that a large part of his professional work consisted in performing operations upon patients brought to him by other doctors. He had operated upon one of the physicians who gave evidence in this cause, and upon the wife of another of said witnesses. The evidence of all six of these witnesses was very laudatory of the personal character and professional ability of appellant. They had never heard of him being suspected of committing criminal abortions untils this proceeding was instituted.

It is conceded by the respondents that "Susie Davis" had no real existence, and that her name was simply used by the post office inspector in carrying on the correspondence with appellant hereinbefore set out.

## OPINION.

I. The theory of respondents is that the letters introduced prove that appellant offered. to commit the crime of criminal abortion upon the mythical "Susie Davis;" in other words, that he was possessed of evil thoughts, or a willingness to commit crime, and therefore, his license to practice medicine and surgery should be revoked.

The statute under which the Board of Health suspended the appellant is as follows:

"The board may refuse to license individuals of bad moral character, *or persons guilty of unprofessional or dishonorable conduct,* and they may revoke licenses, or other rights to practice, however derived, for like causes, and in cases where the license has been granted upon false and fraudulent statements, after giving the accused an oppor-

Statute.

tunity to be heard in his defense before the board as hereinafter provided. Habitual drunkenness, drug habit or excessive use of narcotics, or producing .criminal abortion, or soliciting patronage by agents, shall be deemed unprofessional and dishonorable conduct within the meaning of this section, *but these specifications are not intended to exclude all other acts for which licenses may be revoked.*" · [Section 8317, R. S. 1909.]

That portion of the statute upon which the action of the respondents in finding appellant guilty of dishonorable and unprofessional conduct must be sustained, if it can be upheld at all, is found in the last three lines before quoted, and is as follows: "but these specifications are not intended to exclude all other *acts* for which licenses may be revoked."

Concretely stated, the contentions of appellant are: (1) That the evidence does not prove that he offered to commit the crime of abortion; (2) that if it were satisfactorily proven that he offered, or was willing, to commit said crime the statute does not authorize the State Board of Health to revoke his license or suspend him from the practice of medicine and surgery, because he merely possessed a desire to do a dishonorable and unprofessional act.

II. To properly dispose of the issues we must consider the nature of the right which appellant held as a practicing physician. Is it a mere privilege?

**Rights of Appellant.** Is it a vested right? Is it property? Some of the authorities cited by respondents hold that a license to practice a profession is not property, and not a right at all, but only a privilege which the State may withdraw without the formality of a trial, and without a compliance with the constitutional guaranties (Sec. 10, art. 2, Constitution of Missouri) which protect persons, property and character. [State ex rel. v. Goodier, 195 Mo. l. c. 560.]

I am impressed with the idea that a more logical and rational view was announced by the members of Division One of this court in the recent case of State ex rel. Shackleford v. McElhinney, 241 Mo. l. c. 606, wherein it was held that the right of a licensed attorney to practice law is a "valuable property right."

By analogy, it must be admitted that if the right of an attorney to practice law is a property right, then the duly licensed physician has a property right, protected at least by such safeguards as the Legislature has thrown around it. It is not a mere shadowy privilege which may be revoked regardless of whether the possessor has violated the laws of the State. By what we have said it should not be inferred that we desire to overrule the Goodier case. It is not necessary to disturb that decision in order to reach a correct conclusion in this case.

We approach the solution of this case with the understanding that the appellant, through his license to practice medicine, and through his ability and industry, has become possessed of at least a valuable privilege—perhaps a property right—which has been suspended by the action of the respondents for his alleged violations of the laws of this State.

III. The next preliminary question which arises in the case is, shall that part of section 8317, supra, which authorizes the Board of Health to revoke licenses of physicians, be adjudged a remedial or a penal statute? If remedial, it must be liberally construed in behalf of both respondents and appellant, while if it be a penal law, it must be strictly construed against the respondents, as the representatives of the State, and liberally construed in favor of appellant. [State v. Balch, 178 Mo. 392; State v. Koock, 202 Mo. l. c. 235; State v. McMahon, 234 Mo. l. c. 614.]

*Penal Law.*

This rule is announced in 2 Lewis's Sutherland's Statutory Construction (2 Ed.), section 531:

"Among penal laws which must be strictly construed, those most obviously included are all such acts as in terms impose a fine or corporal punishment under sentence in State prosecutions, or forfeitures to the State as a punitory consequence of violating laws made for preservation of the peace and good order of society. But these are not the only penal laws which have to be so construed. There are to be included under that denomination also all acts which  . . . take away or impair any privilege or right."

A statute which provides for the disbarring of attorneys has been held to be a penal law. [Moutray v. People, 162 Ill. 194.]

A penal statute is construed with a degree of strictness commensurate with the severity of the penalty it imposes, and where the penalty, as in this case, is onerous, no one can be held to have violated its provisions unless his acts come within both the letter and the spirit of the law. [2 Lewis's Sutherland's Statutory Construction (2 Ed.), sec. 520-1; State ex inf. v. Railroad, 238 Mo. 605, 1. c. 612.] All laws, however, must receive a rational, and not an arbitrary, construction.

Upon the well-considered precedents we have no hesitation in holding that the law now in judgment, in so far as it authorizes the revocation of licenses of physicians, is highly penal, and must be treated as a penal law.

IV.   Coming back to the facts in this case we find no insistence in the brief of the Honorable Attorney-General that the conviction and suspension of appellant can be sustained on the advertisement which the appellant published in a newspaper, or upon the evidence of Doctor Hiller to the effect that several physicians of Joplin had told

*Hearsay Evidence.*

him that appellant bore the reputation of being a criminal abortionist. It would certainly have been an insult to the intelligence of the age to contend that a judgment could be sustained on the mere hearsay evidence of Doctor Hiller, which ought not to have been admitted or considered by respondents.

V.   This leaves for our consideration the letters between the appellant and the mythical "Susie Davis."
*Evidence.* It will be observed that appellant did not directly offer to perform an abortion upon "Susie," though the letters written to him were cunningly worded and designed to make it appear that if he agreed to treat her at all he was willing to commit that crime.   There is no expert medical testimony before us which tends to explain whether the symptoms narrated in the letters indicated the presence of a living *foetus,* a dead *foetus,* or some ailment of the womb or genital organs.   The writer of the letter, after describing "her" symptoms, does not say that she is pregnant, but only that she fears she is pregnant.   If the symptoms detailed in the letters indicated the presence of a dead *foetus,* then the replies which appellant made to said letters would not point to an evil purpose or a willingness on his part to commit criminal abortion.

The appellant proved such an excellent reputation by his neighbors—physicians who knew him intimately —that if the letters could have been construed so as to be consistent with an innocent purpose, the Board of Health, being honorable men and learned in the medical science, would certainly have given him the benefit of the doubt and acquitted him.

The fact that they found him guilty must, under the evidence in this case, be taken by us to mean that the symptoms and conditions narrated in the Davis letters unmistakably pointed to the existence of a

living *foetus*, which it would have been a crime to remove or destroy.

VI.   This brings us to the application of the statute to the facts proven.   Did the General Assembly, by the enactment of section 8317, Revised Statutes 1909, mean to designate a mere willingness to commit the crime of abortion as dishonorable and unprofessional conduct?   We may gain some light on this point by a close consideration of the specific acts designated as unprofessional conduct.

Construction of Statute.

There is a well-recognized rule that where a law specifically designates several matters or things which shall be governed by its provisions, and then by general language undertakes to include other acts and things not specifically named, such law must be so construed as to apply only to things or acts of the same general nature as those definitely set out.   [City of St. Louis v. Kaime, 180 Mo. 309, and State ex rel. v. Berryman, 142 Mo. App. 373.]   This is but the restatement of a rule of common sense and everyday experience of mankind.   When a man is speaking only of bonds and promissory notes his mind is not supposed to be dwelling on wagons and threshing machines, and we do not apply his words uttered on that occasion to any such subjects.   If a man speak of wild animals his mind is not likely at the selfsame time to dwell upon domestic animals, and it would be silly to give his words such a construction.

The General Assembly cannot enact a valid law without the minds of its members considering the things to which the law is to apply, for the legislative will is what becomes the law.   In a broad, general sense we discern the legislative will by the words it has spoken through its enactments, the same as we would interpret the language of an individual.

Applying this well-known and simple rule to the statute now under consideration we find.that "habitual drunkenness, drug habit, or excessive use of narcotics" are declared dishonorable and unprofessional conduct; likewise "producing criminal abortion or soliciting patronage by agents" are placed in the same category. The first three specifications, it will be observed, grow out of acts of a physician which tend to weaken or destroy his mind and render him mentally incapable of properly applying his medical skill. The second two specifications pertain to *acts* which are by the Legislature deemed sufficient grounds for revoking a license. It will further be observed that all five of the specifications named grow out of intentional affirmative acts—not a mere contemplation or willingness to perform wrongful acts. The general specification then follows: "but these specifications are not intended to exclude all other acts for which licenses may be revoked." It will thus be seen that the lawmakers, after having particularly designated certain mind-destroying habits and certain wrongful *acts* for which the license of a physician may be revoked, undertook to designate generally that there are other *acts* which may justify such revocation. To my mind, it is clear that the general specification cannot be applied to mere evil thoughts or a consent to do wrong where no wrong is actually done. It could not logically be urged that a mere desire or willingness to use intoxicants or narcotics excessively would impair the mind; and for the same reason it must be held that a mere consent to perform an abortion would not make the appellant an abortionist, or subject him to the penalties of having committed that crime. The general specification of the statute in judgment is directed solely against certain undesignated *acts*—not against evil thoughts or a willingness to perform wrongful acts.

As we have said, the statute in judgment is highly penal and cannot be expanded or enlarged beyond its letter or spirit.  Consequently, it does not support the action of respondents in revoking appellant's license.  We have been taught that a mere desire to do wrong is as great a sin as the act of doing wrong itself.  That rule will be all right when the Creator sits as Judge, but mere courts and boards of health have not the capacity to search out and correctly weigh the many impulses which enter the human mind.  For that reason the State concerns itself mostly about wrongful *acts,* not evil thoughts, and its agents and administrative boards must be governed accordingly.  No one can be deprived of any right or privilege because his mind has been contaminated by evil thoughts, unless the statute has denounced said evil thoughts in plain terms.  However reprehensible it may be for a physician to entertain a desire to commit abortion, his license cannot be revoked unless by a written statute his evil desires are made a ground for subjecting him to that penalty.

Our learned Attorney-General earnestly insists that it was impossible for the General Assembly to designate the numerous acts and things which would constitute "dishonorable and unprofessional conduct" on the part of physicians, and that, therefore, the general specification in section 8317, supra, should be construed to include all acts (and, inferentially, all wicked thoughts and evil desires) which, by "common judgment" are found to be dishonorable.  He cites in support of this contention: People v. Apfelbaum, 251 Ill. l. c. 22; Berry v. State, 135 S. W. l. c. 631; Morse v. State Board of Medical Examiners, 122 S. W. l. c. 448; Spurgeon v. Rhodes, 167 Ind. l. c. 11, 12; and Wolf v. State Board of Medical Examiners, 109 Minn. 360.

The authorities cited tend to support the contention of respondents. The attorneys for the appellant, with equal industry, have cited the following cases which tend to sustain their insistence that the general specification in section 8317, supra, is void for uncertainty: Matthews v. Murphy, 23 Ky. L. R. 750, 54 L. R. A. 415; Ex parte McNulty, 77 Cal. 164, 11 Am. St. 257; Hewitt v. Board of Medical Examiners, 148 Cal. 590; Czarra v. Board, 25 Appeals D. C. 443; and Ex parte Jackson, 45 Ark. 158.

In view of the conflicting opinions of respectable courts on this proposition we will quote what is said by the learned editors of Cyc.:

"The grounds commonly designated by the statute upon which the medical board is authorized to revoke a physician's license or certificate are unprofessional, dishonorable, or immoral conduct. Unprofessional or dishonorable conduct is not defined by the common law, and what conduct may be of either kind is a matter of opinion only. For this reason it has been held in several cases that such a statute is void for uncertainty. Similar statutes have been construed in other jurisdictions without the question of validity being raised, the courts merely considering what can be deemed unprofessional, dishonorable, or immoral conduct." [30 Cyc. 1555 (B).]

There is such a great divergency in judicial thought on this subject that after reading it all we find ourselves groping in a wilderness of confusing precedents. In considering precedents it is usually safest to keep an eye on the rules of common sense which often prove a safer guide than hair-splitting judicial reasoning.

We do not take judicial notice that doctors are more willing to commit crimes than men of other professions. Physicians are usually people of intelligence, with a high sense of the duties and responsibilities of good citizenship. We are, therefore, unwilling to be-

lieve that the physicians of our State, or any of them, are guilty of such a *multiplicity* of wrongful acts that their conduct may not safely be regulated by a single legislative enactment.

By section 4739, Revised Statutes 1909, it is made a crime to offer for sale any secret drug designed to prevent conception, and it would be the rankest folly to say that it would have been more difficult to prohibit physicians from offering to commit abortion than it was to prohibit persons from offering for sale obnoxious drugs. We, therefore, hold that it would have been possible for the General Assembly to designate the particular offenses for which they intended that the licenses of physicians might be revoked.

Another theory of the Attorney-General is that the general specification in section 8317, supra, must be construed to authorize the Board of Health to determine what shall constitute dishonorable and unprofessional conduct. This point does not deserve serious consideration. To grant the Board of Health that power would be to concede that it has the right to enact from time to time such laws as it deems necessary to regulate the conduct of physicians and surgeons. We give the honorable members of the Board of Health credit with possessing too much good judgment to attempt to assume the role of lawmakers.

If section 1, article 4, of the Constitution of Missouri, vesting in the General Assembly the power to make laws, and article 3 of said Constitution prohibiting executive officers from performing legislative functions, could both be suspended, and the Board of Health given power to legislate, the respondents would be in no better condition, so far as the facts of this case are concerned. It nowhere appears in this record that prior to the institution of this action to revoke appellant's license the State Board of Health had ever enacted, or pretended to prescribe, a law or rule prohibiting physicians from offering to commit abortion.

The General Assembly is prohibited from giving its enactments retrospective effect, and if we concede legislative powers to the Board of Health (which we do not) that board would have to be governed by the same Constitutional limitations. [Sec. 15, art. 2, Constitution of Missouri.]

The action of the State Board of Health in suspending the appellant from the practice of medicine and surgery should be quashed and for naught held; and the judgment of the circuit court of St. Louis City sustaining and upholding the action and finding of the Board of Health should be reversed. It is so ordered. *Walker* and *Faris, JJ.,* concur.