STATE EX REL. ROBERT LENTINE, Appellant, v. STATE BOARD OF HEALTH ET AL.—65 S. W. (2d) 943.

Division One, December 6, 1933.

*J. Henry Caruthers* for appellant.

222

*Roy McKittrick,* Attorney-General, and *Harry G. Waltner, Jr.,* Assistant Attorney-General, for respondents.

FERGUSON, C.—In 1929 the relator, Robert Lentine, was licensed by the State Board of Health, under the Medical Act of this State (Art. 1, Chap. 53, R. S. 1929), to practice medicine and surgery. On June 11, 1930, after due notice and hearing upon charges made the State Board of Health revoked the license. Lentine thereupon petitioned the Circuit Court of the City of St. Louis for a review of "the proceedings of said board revoking his license and the evidence therein" (Sec. 9120, R. S. 1929) and the writ of certiorari provided for by said Section 9120, supra, was issued by that court. The proceedings of the Board of Health were sustained by the circuit court and this appeal followed.

■ Upon the oral argument in this court some question was suggested as to our jurisdiction of this appeal. The respondents are the members of and constitute the State Board of Health and it has heretofore been held that their "jurisdiction as members of the State Board of Health is co-extensive with the boundaries of the State and hence they are classed as state officers" within the meaning of that clause of Section 12, Article 6, of our Constitution giving this court jurisdiction "in cases where . . . any State officer is a party." [State ex rel. Conway v. Hiller et al. (State Board of Health), 266 Mo. 242, 180 S. W. 538.] In a similar case wherein the circuit court quashed the proceedings of the State Board of Health we said upon appeal:

"Respondent insists that no appeal lies to the Supreme Court from said judgment of the Circuit Court of the City of St. Louis. While we have held that the State Board of Health is not a court

or judicial body (State ex rel. v. Goodier, 195 Mo. 551, 93 S. W. 928), yet when relator availed himself of the right of review given by Section 7336, Revised Statutes 1919, and filed his petition in the Circuit Court of the City of St. Louis for a writ of certiorari against the members of the State Board of Health, that proceeding was a 'case' within the meaning of Section 12, Article 6, of the Constitution, and as respondents are state officers within the meaning of said section an appeal from the decision of the trial court in the certiorari proceeding properly goes to the Supreme Court." [State ex rel. Horton v. Clark, 320 Mo. 1190, 1195, 9 S. W. (2d) 635.]

The statutory writ of certiorari provided for by Section 9120, supra, and whereby a right of review by the circuit court of the proceedings of the State Board of Health is granted, is much broader in its scope and effect than the common-law writ of certiorari. [See State ex rel. Horton v. Clark, supra.] Said section of the statute provides that, "Any person whose license has been or shall be revoked by the board shall have the right to have the proceedings of said board revoking his license and all the evidence therein reviewed, on a writ of certiorari, by the circuit court of the county in which said board held its session when said license was revoked. Said writ . . . shall command the said board and the secretary thereof to certify to said court the record and proceedings of said board, and a complete transcript thereof, and of all the evidence therein pertaining to the revocation of said license." The statute then requires that the "petition for the writ of certiorari shall set forth the rights of the petitioner and the injuries complained of by him." We shall therefore confine our review to the matters of which relator complains by his petition to the circuit court and which were necessarily passed upon by that court in arriving at its judgment sustaining the proceedings of the Board of Health. Omitting wholly formal and preliminary allegations the petition follows:

"Relator states that on or about the 11th day of June, 1930, he was duly qualified, registered and licensed physician under the laws of Missouri.

"Relator further states that on or about the —— day of May, 1930, the State Board of Health of Missouri caused to be issued and served upon relator notice of a purported complaint, which notice is in words and figures as follows (caption, signature, etc., omitted):

"You are hereby notified that there is a complaint against you charging you with the violation of Section 7336 of the Revised Statutes of Missouri, 1919, in that you being a regular licensed practicing physician in the city of St. Louis, Missouri, have been guilty of unprofessional and dishonorable conduct and that you are of bad moral character in this namely, that you on or about the 3rd day of March, 1930, violated the Criminal Statute of the State of Illinois,

relating to the unlawful sale of diplomas for the practice of medicine; and that you on or about said date entered a plea of guilty to said charge in the criminal court of Cook County, Illinois. On account of such complaint the State Board of Health will consider whether or not your license as a practicing physician in Missouri ought to be revoked.

"Wherefore, you are hereby notified to appear before the State Board of Health at the Jefferson Hotel in St. Louis, Missouri, on the 11th day of June, 1930, at nine o'clock A. M. to answer said complaint. : . .

"Relator further states that pursuant to said notice he, together with counsel, appeared at the time and place designated therein, and after hearing all the evidence and arguments of counsel representing both parties, The State Board of Health of Missouri revoked permanently the license of relator to practice medicine and surgery in Missouri.

"Relator further states that said purported ground of revocation, to-wit: 'Unprofessional and dishonorable conduct,' does not state facts sufficient to constitute a cause of action against relator, for the reason that the statute (Sec. 9120, R. S. Mo. 1929) defines 'unprofessional and dishonorable conduct' in the following language: 'Habitual drunkenness, drug habit, or excessive use of narcotics, or producing criminal abortion, or soliciting patronage by agents, shall be deemed unprofession and dishonorable conduct within the meaning of this section;' that said alleged complaint has nowhere charged relator with any one of said offenses constituting 'unprofessional and dishonorable conduct.'

"Relator further states that said purported complaint attempts to charge him with the alleged offense of being 'of bad moral character;' that this alleged offense is not defined by the statute; that said Section 9120, R. S. Mo. 1929, authorizing the revocation of medical licenses for certain causes therein set out, is highly penal in its character, and should be strictly construed; that the meaning of the words, 'bad moral character' are so vague, ambiguous, indefinite and uncertain as to render the purported charge of 'bad moral character' unenforceable; that the words do not inform one clearly enough to enable one to know whether one is violating their meaning or not; that what conduct in the mind of the personnel of one Board of Health might constitute 'bad moral character' might not be so considered by the personnel of another Board of Health, or, what conduct one court might consider 'bad moral character' might not be so considered by another; that the personnel of each Board of Health and each court can, through the use of these words, make their own penal statute for the revocation of a medical license, instead of the Legislature, to whom that power alone belongs.

226

"Relator further states that he has not consciously been guilty of such conduct as to render him a man of 'bad moral character,' and has been guilty of no acts or conduct as a licensed physician authorizing respondents to revoke his license to practice medicine and surgery in Missouri."

The prayer was that a writ of certiorari issue in conformity with the provisions of the statute set out supra. Pursuant to the command of the writ, which was thereupon duly issued and served, a complete transcript of the record and proceedings of the Board of Health in such matter including what purports to be "all the evidence therein" was certified to the circuit court. At the hearing in that court respondent's motion to quash the writ was sustained.

The same complaints set forth in relator's petition are urged here upon this appeal. Consideration thereof necessitates a summary of the evidence and reference to the pertinent parts of the statute involved. The charges made and which were held, by the board and the circuit court upon review, to be sufficient are set out in relator's petition, supra. The pertinent part of the statute (Sec. 9120, R. S. 1929) reads:

"The board may refuse to license individuals of bad moral character, or persons guilty of unprofessional or dishonorable conduct, and they may revoke licenses, or other rights to practice, however derived, for like causes, and in cases where the license has been granted upon false and fraudulent statements, after giving the accused an opportunity to be heard in his defense before the board as hereinafter provided. Habitual drunkenness, drug habit or excessive use of narcotics, or producing criminal abortion, or soliciting patronage by agents, shall be deemed unprofessional and dishonorable conduct within the meaning of this section."

The evidence is not, apparently set out in full in the record here but no question is made that it is not sufficiently stated to advise us of the facts and circumstances which the Board of Health deemed to constitute sufficient cause, under the statute, for the revocation of relator's license. The writer however, finds difficulty in stating the circumstances, various moves, acts and motives of the parties engaged in the conspiracy shown to procure by means of chicanery, corruption and bribery the issuance of licenses to practice medicine and surgery in the State of Illinois to some six or seven men in the State of Connecticut who could not qualify or meet the requirements for the practice of medicine under the laws of that state, so that the implications and conclusions which so readily arise upon reading the testimony, and especially that of relator himself, may be fully developed. From the testimony of the relator, Lentine, it conclusively appears that he played a major part in the conspiracy. Lentine and certain others involved, were indicted for such conspiracy

and convicted in the criminal court of Cook County, Illinois, and Lentine was sentenced to imprisonment in the county jail for a term of two months which he served. The indictment was brought after Lentine had been granted a license in Missouri and in licensing him here our Board of Health apparently had no knowledge or information whatsoever of his prior participation in, or conduct in reference to, the corrupt and fraudulent schemes to circumvent and evade the law of the State of Illinois regulating and governing the practice of medicine and surgery in that state. From Lentine's testimony at the hearing by the Board of Health as well as an excerpt from his testimony in the criminal court of Cook County, Illinois, which he offered in evidence and which was made a part of the record in this case, we compile the following statement of his history and career and of the events which culminated in his indictment and conviction as aforesaid. It appears not unlikely that he has stated these matters in the most favorable light possible to himself. Lentine states that he was born and reared in Brooklyn, New York; graduated from Manual Training School in that city; "took premedical training at Long Island College Hospital; had a year and half of medicine at the New York Homeopathic Medical School and in the sophomore year five of us boys felt we were going to flunk and we came to the St. Louis College of Physicians and Surgeons, spent two years there and graduated" from that school in 1922. Without further comment we observe here that in reading the testimony his purpose and motive in leaving the medical schools of his home State of New York and entering the St. Louis school is apparent. In 1923 he took the examination in this State for a license to practice medicine and surgery in Missouri but the board reported he had failed to pass and refused to issue a license. From 1923 to 1925 he was employed in St. Patrick's Dispensary in St. Louis. In 1925 he returned to the State of New York and remained there until some time in 1928 during which period he practiced medicine as "an assistant to Dr. Louis Levin" in Brooklyn. He had not yet obtained a license to practice medicine in any state but was desirous of, and intent upon, doing so. Whether the kind of work in which he engaged in New York from 1925 to 1928 was legitimate and legalized under the Medical Act of that state does not appear, however he was not licensed to practice medicine in that state. He had investigated or weighed the possibilities of taking the examination in Illinois. The board of that state seems to have been invested with discretion as to the admission of graduates of a certain class of medical schools to examination in that state and to have looked with disfavor upon this St. Louis College of Physicians and Surgeons from which Lentine had graduated. As Lentine at one time puts it: "I wanted to get admitted to the Illinois examination and

couldn't on account of my graduation from P. & S. without the
discretion of the Illinois Board.'' In May, 1928, a friend told him
a Dr. Kalmus of New York City had contacts with the Illinois State
Board whereby it could be arranged for him (Lentine) to be ad-
mitted to the examination in that state. Lentine says he approached
Kalmus who claimed that for two thousand dollars he could ar-
range the matter satisfactorily, but Lentine informed him that ''it
was impossible for me to get'' that amount of money. Later about
July or August, 1928, Lentine again called upon Kalmus at the re-
quest of Kalmus. On that occasion, so Lentine relates, Kalmus
asked him if he was acquainted with one Barron a former Brooklyn
man who then resided in Chicago and who had attended the St.
Louis medical school with Lentine. Lentine told Kalmus that he
was acquainted with Barron and Kalmus then said, ''Barron is the
key man of Illinois,'' and related that he (Kalmus) for a considera-
tion in money paid Barron had theretofore obtained, through Bar-
ron, licenses for several men who wanted to practice medicine in
Illinois, but who apparently could not meet the requirements of the
Illinois law. However, in a later case, it seems Barron not only
increased the price demanded of Kalmus, but ''pocketed'' the money
finally paid over and failed to deliver. Kalmus told Lentine that
he (Kalmus) then had five or six ''candidates,'' Connecticut men,
who wanted Illinois licenses, and proposed that Lentine get in touch
with Barron and pretend that he (Lentine) was handling the deal
so that Barron would not know that Kalmus was involved. Lentine
says he consented to undertake the enterprise on condition that
Barron would agree to compensate him by obtaining permission for
him to take the Illinois examination. As the writer understands
Lentine's testimony, he claims Kalmus agreed and promised to pay
all of his expenses in putting over the deal and until he was ad-
mitted to examination in Illinois. Pursuant to Kalmus' directions
Lentine in New York, called Barron, in Chicago, by telephone,
identified himself and stated the proposition, representing that he
(Lentine) was acting for the six Connecticut men and told Barron
they could pay six hundred dollars each. Barron replied: ''All
right, come on down with the six hundred for each.'' Whereupon
Kalmus and Lentine went to Springfield, Illinois, registering at
different hotels, Kalmus paying the expenses, and Lentine got in
touch with Barron who made trips to Springfield, to see Lentine
and carry on negotiations. After about two weeks Barron ''boosted
the price . . . said, 'we can't do it for six hundred.' '' Lentine
then was authorized by Kalmus, who remained all the time behind
the scenes, to increase the offer to ''eight or eight hundred and fifty
dollars for each.'' The writer cannot definitely determine the
amount finally agreed upon, that however, is immaterial. When an

agreement was reached between Barron and Lentine, Barron demanded that one-half be paid in advance. Lentine obtained the one-half from Kalmus and paid it over to Barron. But the days passed and Barron failed to produce the six (or Lentine says at one place there may have been seven) licenses for the men back in Connecticut. Kalmus left the money with Lentine to pay the unpaid half of the graft money when and if Barron delivered the licenses and departed for New York. Some two weeks later Barron did deliver six or seven purported licenses to Lentine received the balance of the agreed amount and promised to see that Lentine was admitted to examination in Illinois at the next regular time for same, the following November. Lentine then took the purported licenses to Kalmus in New York and presumably the six or seven Connecticut men entered upon the practice of medicine in the State of Illinois.

Lentine says pursuant to the understanding with Barron he returned to Chicago in November at the time fixed for the medical examination, but Barron advised: ''You had better wait until next month when the Chicago Medical boys take the examination; it will be easier for you because they are all 'C' college men.'' Lentine's testimony as to this continues: ''So I went back a month after but the morning of the examination, about ten o'clock, Barron comes up with a car to take me to the Board. I says, 'how can I take the Board at ten o'clock when the examination starts at nine o'clock.' '' Lentine did not take the examination in Illinois and so far as appears never so much as made application to the proper authorities to be admitted to examination. He states that after the December episode he became ''disgusted'' and left Chicago and went to St. Louis and ''that was the last I heard of the whole thing until they arrested me here'' (St. Louis) in 1929, about a year later. Lentine denies that he retained any ''cut'' or part of the money which he handled in the transaction but the brief filed by the Attorney-General refers to certain statements found in Lentine's testimony in the criminal court as well as other statements appearing in other parts of his testimony and points out that the conclusion follows therefrom that Lentine received from $150 to $250 on each of the six or seven licenses he undertook to purchase and the construction so placed upon his testimony seems warranted. Further Lentine states that Kalmus paid all his expenses and in reciting his misadventures in November and December in reference to failure to obtain admission to the Illinois examination says ''meanwhile I was getting my expenses from Kalmus'' and admits that he ''padded the expense account.'' The implication from certain of the questions and answers in Lentine's testimony in the criminal court is that the licenses delivered to Lentine by Barron were counterfeit and that the signatures and seals thereon were forgeries

and if that inference is not correct certainly the licenses were not legally issued and were wholly invalid and the pseudo doctors from Connecticut ere long found themselves without any badge or pretense of authority to treat the sick in the State of Illinois despite the fact they had each paid to Kalmus, as indicated by the evidence, as much as twenty-five hundred dollars to obtain the Illinois license. Though these Connecticut men did not come to Illinois, take any examination there, comply in any respect or in any manner with the laws of that state governing the right to practice medicine in Illinois, as Lentine well knew, and though he tacitly admits that it was contemplated and supposed that Barron would and could procure the issuance of the licenses by and through bribery of officials of the State of Illinois yet Lentine presumes upon the intelligence of our State Board of Health and the courts by taking a position which is, in effect, that he was not aware of doing anything improper, wrongful or immoral in lending himself to the scheme which he says Kalmus instigated and proposed and Barron consummated. He endeavors to pose as a mere pawn in the hands of these two men and the innocent victim of their villainies. He claims he thought the licenses were "genuine," valid licenses duly issued under the laws of the State of Illinois. He says, "Barron told me they (the licenses) came right from the State House and it had cost ten thousand dollars to get introduced to those people to get the different things done." Apparently the only wrong he conceives of is that he took money from the Connecticut men and paid it out for a scrap of paper which was ineffectual to make them doctors in Illinois when the agreement was that for a price each of them would be constituted a full fledged physician and surgeon in that state. Lentine's sense of wrong is aroused only in that the corrupt and fraudulent scheme was discovered and his clients deprived of the fruits of the bargain, the purported sale and purchase of a license to practice medicine in the State of Illinois. His course of conduct indicates a spirit of contempt for the laws enacted for the protection of the health and life of the people and the maintenance of proper standards and requirements of learning, skill and moral integrity in an honored and trusted profession into whose keeping such important interests are committed and reveals his concept of professional ethics, conduct and honor. We think relator's conduct in respect to and attitude toward the medical profession would in "common judgment" be deemed and condemned as dishonorable and unprofessional. [State ex rel. Hathaway v. State Board of Health, 103 Mo. 22, 15 S. W. 322.]

Reverting to relator's petition herein setting forth "the injuries complained of by him" we find two principal propositions presented, viz: (1) that neither the charge of "unprofessional and dishonorable conduct" as made nor the evidence adduced is suffi-

cient to constitute cause for revocation of his license within the meaning of the statute supra, and (2) that the charge of "bad moral character" is too "vague, ambiguous, indefinite and uncertain" to be "enforceable" and that whatever construction be placed on such term yet relator "has not consciously been guilty of such conduct as to render him a man of 'bad moral character.'" The argument to sustain the first of these propositions is that it is neither charged nor shown that relator was guilty of or had committed any of the acts enumerated in the statute, supra, any one of which the statute declares shall be deemed "unprofessional and dishonorable conduct;" the acts or conduct so enumerated being, "Habitual drunkenness, drug habit or excessive use of narcotics, producing a criminal abortion, or soliciting patronage by agents." If the statute be given the construction for which relator contends it must be held that it was intended that only the enumerated acts should constitute unprofessional and dishonorable conduct for which the State Board of Health may either refuse to license applicants or revoke licenses or rights to practice medicine theretofore granted. Relator cites the case of State ex rel. Spriggs v. Robinson et al., Comprising the State Board of Health, 253 Mo. 271, 161 S. W. 1169. An attempt was made in that case to show that the physician had offered to commit a criminal abortion not however that he had actually done so or attempted to do so. The decision is predicated upon the theory that the statute is leveled at acts and the mere willingness or consent to do a wrongful act or the contemplation thereof "where no wrong is actually done" does not come within the statute. But the case is not cited as being analogous on facts but rather for the discussion and construction of the statute found therein. The statute at that time read:

"The board may refuse to license individuals of bad moral character, or persons guilty of unprofessional or dishonorable conduct, and they may revoke licenses, or other rights to practice, however derived, for like causes, and in cases where the license has been granted upon false and fraudulent statements, after giving the accused an opportunity to be heard in his defense before the board as hereinafter provided. Habitual drunkenness, drug habit or excessive use of narcotics, or producing criminal abortion, or soliciting patronage by agents, shall be deemed unprofessional and dishonorable conduct within the meaning of this section, *but these specifications are not intended to exclude all other acts for which licenses may be revoked.*"

It would likely be commonly considered in the light of the ordinary construction and meaning of the language used in the concluding clause of the statute, supra, which we have italicized, that the Legislature thereby intended to specifically state that acts or conduct constituting unprofessional and dishonorable conduct were

not to be restricted to those enumerated and that by specifying certain acts it was not intended that other acts or conduct which in fact and by common judgment were of such a character as to constitute unprofessional and dishonorable conduct were to be excluded from the operation of the statute. However this court making a strict application of the *ejusdem generis* rule held that since the statute specifically designated several "matters or things" which should "be governed by its provisions" that the general language which followed (italicized above) must be held to apply and be limited to only acts and conduct of the same general nature as those specified. If the construction thus given the statute correctly reflected the legislative intent we do not perceive the purpose served by the Amendment of 1919 (Laws, 1919, p. 499), striking out of the statute the words: "but these specifications are not intended to exclude all other acts for which licenses may be revoked," and leaving the statute otherwise unchanged. Since the Amendment of 1919, that part of this section of the statute involved has remained as it was left by the amendment and reads as we have first quoted it supra. We think it a justifiable assumption that the Legislature having sought, as seems apparent, by definite language to declare that unprofessional and dishonorable conduct within the purview of the statute should not be restricted and limited only to the acts enumerated or acts of the same nature and falling within one of the acts enumerated was moved to strike out this clause by reason of the holding of this court, supra, construing the language thereof to so limit the term "unprofessional and dishonorable conduct," intending thereby to do away with the restriction thus imposed. After the decision in State ex rel. Spriggs v. Robinson and prior to the Amendment of 1919, this court decided the case of State ex rel. Conway v. Hiller et al., Constituting the State Board of Health, 266 Mo. 242, 180 S. W. 538. Conway, a physician in Boone County was cited before the State Board of Health on a charge of unprofessional and dishonorable conduct. The proceedings were brought under the identical statute construed in the Spriggs case but we find no reference to the Spriggs case nor application of the holding therein to the charge and facts in the Conway case. The opinion in the Conway case sets out the facts shown; that Boone County had adopted a local option law and thereafter Conway, a licensed physician engaged, on a rather extensive scale, in the business of writing prescriptions for whiskey to be used as a beverage charging fees therefor and within a period of six weeks issued 778 such prescriptions. By reference to the statute it will be seen that such conduct does not fall within any of the acts there designated nor is it of the same nature as any of such acts nevertheless having stated the facts this court disposed of the case and sustained the action of the Board of Health in revoking Conway's license in this very concise manner:

"It needs no citation of authorities to demonstrate that appellant's conduct aforesaid, as disclosed by the undisputed facts in the record, was both unprofessional and dishonorable." In so doing the court, without weighing and analyzing the statute by the technical rules of statutory construction, seems to have been satisfied with the view that professional conduct on the part of a licensed physician of such a nature as by common judgment is deemed both unprofessional and dishonorable, though not named therein, comes within the purview of the statute and is cause for revocation of his license.

█ It is well settled that the power given to certain boards or officers to grant a license to practice medicine and surgery within the State as well as to revoke such license for good cause upon charges preferred and a hearing thereon, is an exercise of the police power. "The interest of the State in the practice and character of physicians does not by any means cease with the granting of licenses. Clearly the State has the power to revoke the licenses for good cause. . . . Grossly immoral conduct connected with the practice may be cause for revocation. . . . A provision would seem valid if to the effect that a license may be revoked because of grossly unprofessional conduct or conduct grossly unprofessional and dishonorable, for a fair interpretation of these terms is that they mean conduct which is by general opinion considered to be grossly unprofessional because immoral or disreputable. Unprofessional conduct as used in statutes does not mean merely unethical conduct as judged by the peculiar standards of the profession but is generally held to mean dishonorable conduct. The mere fact that conduct is unprofessional is not enough to justify revocation but it must have an additional quality" as for example be also dishonorable or disreputable. [21 R. C. L., p. 363.] █ At the citation given and in the Ruling Case Law supplements authorities will be found fully supporting the quoted text and in the examination of the cases the weight of authority is to the effect that statutes providing that the license of a physician may be revoked by the board or officers is not rendered uncertain or otherwise invalid because the grounds for revocation are therein stated in general terms (see annotation 5 A. L. R. 94). In the People ex rel. State Board of Health v. Apfelbaum, 251 Ill. 18, 95 N. E. 995, one claim made by the physician whose license had been revoked was that the Medical Act under authority of which the board acted was void for uncertainty. As to that contention the Supreme Court of Illinois said: "Section 6 is not void for uncertainty. It authorizes the refusal of the license for certain specific reasons, and also generally for unprofessional and dishonorable conduct, and provides that the license may be revoked for the same reasons. The reasons particularly named are certain enough, but it would scarcely be possible for the statute to catalogue specifically every act of unprofessional or dishonorable

conduct which would justify the refusal or revocation of a license."

We are constrained to hold that the use of the general terms "bad moral character" and "unprofessional and dishonorable conduct" in specifying the grounds for revocation of a physician's license does not render our statute so uncertain, vague or ambiguous as to be unenforceable. Certainty is required in this that in preferring a charge the licentiate is entitled to be advised and informed of the specific acts or course of conduct on his part alleged to be unprofessional and dishonorable or made the basis of a charge of bad moral character. ▮ After due notice the question whether the acts, or conduct, charged are such as to constitute unprofessional and dishonorable conduct or render the licentiate a person of bad moral character within the purview of the statute "calls for the exercise of judgment and sound discretion" on the part of the Board of Health. The board must hear and weigh the evidence and "pronounce a conclusion" (State ex rel. Hathaway v. State Board of Health, 103 Mo. 22, 15 S. W. 322), and if the board order the license revoked the physician may then have the finding and order of the board fully reviewed by the courts. [Sec. 9120, R. S. 1929.]

But relator argues that by enumerating certain acts and saying they shall be deemed unprofessional and dishonorable conduct the Legislature thereby intended to define the term unprofessional and dishonorable conduct and to limit and restrict the operation of the statute to those acts alone excluding any and all other acts affecting the practice of medicine however reprehensible, immoral or unlawful such acts may be. In the State of Rhode Island the Medical Act provides for revocation of a license for "gross unprofessional conduct." A licensed physician of that state made a business of issuing prescriptions for morphine and cocaine to drug addicts and in some instances to known vendors of such drugs. Upon such facts and under the statute his license was revoked. [Knoop v. State Board of Health (R. I.), 103 Atl. 904.] Given the construction for which relator contends since such conduct does not come within any of the acts enumerated in our statute a physician licensed in this State could follow such a reprehensible and immoral practice with impunity so far as his right to practice medicine is concerned and without being subjected to deprivation of his license. We have heretofore touched upon this contention and indicated that we do not think the statute should be given such a narrow or restricted construction. It is argued that the statute is penal and should be strictly construed citing the Spriggs case supra and State ex rel. Johnson v. State Board of Health, 288 Mo. 659, 232 S. W. 1031. We said in State ex rel. Horton v. Clark, 320 Mo. 1190, 9 S. W. (2d) 635:

"We have held this statute penal, and ruled that the acts for the commission of which the valuable privilege or right to practice

medicine and surgery may be taken away must come within both the letter and the spirit of the law. [State ex rel. Spriggs v. Robinson, 253 Mo. 271, l. c. 285, 161 S. W. 1169.] Nevertheless, it is a wholesome and well-recognized rule of law that powers conferred upon boards of health to enable them effectually to perform their important functions in safeguarding the public health should receive a liberal construction. [29 C. J., sec. 30, p. 248, also, Sec. 6, p. 243.]"

It may be considered trite to again observe that the primary and fundamental purpose in statutory construction is to ascertain and give effect to the legislative intent nevertheless such is always the end sought and the numerous rules for the interpretation or construction of statutes are merely aids in the quest. But such rules should not be so applied as to restrict or confine the operation of a statute within narrower limits or bounds than manifestly intended by the Legislature and whether the proper construction of a statute should be strict or liberal it certainly should be such as to effectuate the obvious purpose of its enactment and the evident legislative intent. Reference should be had to the policy adopted by the Legislature in reference to the subject matter, the object of the statute and the mischief it strikes at or seeks to prevent as well as the remedy provided. [9] Looking to the policy and object of our Medical Practice Act as a whole we find it to be an exercise of the inherent police power of the State in the protection of its people attempting to secure to the people the services of competent practitioners learned and skilled in the science of medicine, of good moral character and honorable and reputable in professional conduct. The license granted places the seal of the State's approval upon the licentiate and certifies to the public that he possesses these requisites. This particular section of the Medical Act seeks to prevent an immoral or dishonorable person from procuring a license to practice medicine in this State or if a licensed physician is found to be of bad moral character or guilty of unprofessional and dishonorable conduct this section of the statute authorizes and empowers the Board of Health, the proceeding before the board with the right of review by the courts being prescribed, to revoke the license. The section in question first provides that the board "may *refuse* to license" persons "of bad moral character or persons guilty of unprofessional or dishonorable conduct" and second "may *revoke* licenses, or other rights to practice, however derived, for like causes." The grounds for refusal of a license and for revoking a license are identical. We find the following quotation from the text in 21 Ruling Case Law, page 362, stated in varied language but in substance the same in numerous cases: "There is no possible distinction between refusing to grant a license and revoking one already granted. . . . The object . . . in each case is identical,

viz: to exclude an incompetent or unworthy person from the practice of medicine.'' Thus in the first lines of the section we find its object and paramount purpose and the thing it seeks to prevent as well as the method or means of prevention declared. It will be noted that the subsequent provisions do not in so many words undertake to define unprofessional and dishonorable conduct, i. e., it is not said that such terms as therefore used are defined to mean the acts and conduct then named nor that only those matters and things so named shall constitute unprofessional and dishonorable conduct. In particularizing that habitual drunkenness, drug habit or excessive use of narcotics, criminal abortion, and soliciting patronage by agents shall be deemed unprofessional and dishonorable conduct we do not, in view of the broad intendments found in the preceding general language, think that the Legislature intended to thereby exclude all other acts or conduct affecting the practice of medicine and the moral conduct of the physician, in that connection, which by common opinion and fair judgment are found to be in their very nature unprofessional and dishonorable, as grounds or cause for revocation of a license. Rather upon a showing of any of the things enumerated the Board of Health, and the court upon review, is not called upon in its sound discretion to determine whether such conduct is such as in common judgment is deemed unprofessional and dishonorable for the statute has expressly declared it so to be. It would not be practicable to the carrying out of the wholesome purpose of the statute to undertake to catalogue, list or specify each and every act or course of conduct which would, or under what circumstances, constitute bad moral character or unprofessional and dishonorable conduct and we do not think the Legislature intended to do so. The Amendment of 1919, as we have observed, might logically be taken to indicate a purpose to be rid of the seeming restriction and limitation which the court had placed upon the statute in its construction of the language stricken out and to permit the statute to operate as to acts other than those named which in their nature are, and by common opinion deemed, unprofessional and dishonorable. So far as State ex rel. Spriggs v. Robinson, supra, is not in accord with what is said herein it should no longer be followed.

With the view we have as to the general legislative intent we cannot adopt the narrow construction relator would give the statute and it therefore follows that the judgment of the circuit court sustaining the action of the Board of Health should be and is affirmed. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.