WILLIAM T. KNOOP *vs.* STATE BOARD OF HEALTH.

JUNE 13, 1918.

PRESENT:   Parkhurst, C. J., Sweetland, Vincent, Baker, and Stearns, JJ.

*(1)   State Board of Health.   Appeal.*

On appeal from finding of State Board of Health evidence considered and held that appellant had been guilty of gross unprofessional conduct and of conduct making him an unfit person to practice medicine in the State and finding of Board revoking certificate of appellant affirmed.

APPEAL from finding of State Board of Health and appeal dismissed.

STEARNS, J.   This case arises on appeal from the decision of the State Board of Health and the order of said board

revoking the license of the appellant to practice medicine. The case was recently before this court on petition of the appellant for a writ of *certiorari*. See *William T. Knoop* v. *State Board of Health*, 40 R. I. 561, and reference is made to the report of that case for the preliminary history of the case.

The case was heard *de novo* by this court on the oral testimony of witnesses given before the court on the question whether or not the license of appellant should be revoked for any of the causes specified.

Twelve witnesses were produced by the State who testified in regard to the procedure by which numerous prescriptions for morphine and cocaine were secured from and furnished by the appellant, Dr. Knoop, who had been in practice since 1906 and had his office on Broadway in the city of Providence. Prior to 1916 he had had no practice with the class known as "drug addicts." In 1916 and thereafter his practice to a very considerable extent appears to have been confined to this particular class who visited the doctor at his office at more or less regular intervals and there secured from him the prescriptions for the drugs. The majority of the witnesses testified that no physical examination of any kind was made by the doctor before prescribing the desired drug; that they stated the amount of morphine which they were accustomed to use and upon payment of the fee charged they were given a prescription to start with, usually for 60 grains, and were told that they must make this last a week and that they must go for as long a time as possible before returning for another prescription, and that the amount of the prescription would be reduced each time a new one was called for. In no case does it appear that these patients were ever visited in their homes or that any directions were given to assist these sufferers in freeing themselves from the drug habit. As a matter of fact many of the patients did not want to be cured, but on the contrary they desired to get their regular supply of drugs and to continue the use of drugs; many of them would and did use any stratagem or deceit, if necessary, to secure large and fre-

quent supplies. One or more of the addicts treated by the doctor were known to be men who had criminal records, others were known to be venders of the drug whenever they were able to secure an extra supply. There were two families in which both husband and wife had been treated by the appellant at his office. These people appeared to be reputable working people, and one of them has since been cured of the drug habit, not however as a result of the appellant's treatment. The wife of the last mentioned patient is a robust, healthy woman who did not use drugs at all, but acting by direction of her husband she became a patient of appellant and secured a number of prescriptions for morphine, nominally for her own use, but in reality for the use of her husband and a friend of his. This woman swears that the appellant made no examination of her, but gave her a prescription upon her request and statement that she was accustomed to using drugs. The doctor testifies in this case, as in every other case, that he did examine the patient; that as the woman claimed to take the drug by eating it, rather than by the usual method of hypodermic injection, it was more difficult to discover by examination whether she was telling the truth, but that finally he became convinced, principally from the appearance of her eyes, that the woman was an addict and then gave her a prescription for morphine.

The court saw the witnesses and heard them testify and we are satisfied in the case of this woman and in certain other cases that no examination of the patient was made before the prescription for the drug was given.

The so-called treatment of these patients was the same regardless of their physical and mental condition, past history or environment. In response to questions the doctor testified as follows: "311 Q. Did you ever try to prescribe for any of these patients any substitute for morphine? A. I have prescribed in a number of instances. I had quite a few patients taking what I call my cure, that is a cure I had. 312 Q. Did you try this cure on any of these patients that

testified in this case?   A.  None of these here.   313 Q: Then you did have something you could give in place of morphine?   A.  I did suggest it to them and wanted them to take it in liquid and tried hard and tried the best I could to influence them to take it that way."

In numerous instances the patients by paying an additional fee secured prescriptions for cocaine also; the excuse for using this given by the patient was that the cocaine relieved the pain caused by the needle when the morphine injection was taken.   The appellant says that the cocaine was prescribed in one case for neuralgia or neuritis and in other cases to relieve the patients from constipation, one of the common results of drug using.   Neither explanation is convincing.   The patient undoubtedly wanted the cocaine to satisfy the craving for drugs.   The cocaine habit is as well recognized by the medical profession as the morphine habit, and as stated by one of the medical witnesses in regard to this particular subject, it does not seem fair for the sake of relieving the ailments above mentioned to take the risk of fastening an added drug habit upon a patient who is already a victim of the morphine habit.   Whenever a cocaine prescription was written an extra charge, usually $1.00, was made in addition to the customary charge to the morphine user of $2.00.

The appellant claimed that the treatment given to these patients was given in good faith and in accordance with recognized medical practice of "cure by reduction."   Testimony was given in regard to this form of treatment to show that the method was to decrease regularly and continuously the amount of the drug taken by the patient and to deprive the patient of the drug entirely as soon as feasible.   It appears that this method has been used with more or less success when applied in institutions where the patient was under the constant observation and continued control of the physician, where the amount of each dose could be regulated by the physician and not by the patient, and that in some cases it had been used with success outside of an

institution when the patient was possessed of strong will power and a fixed determination to be cured; but if the patient was lacking either in the necessary will power or the desire to be cured, that this treatment would be of no avail. One of the physicians who testified on behalf of the appellant testified very frankly that he would not undertake the treatment outside of an institution of an addict who did not desire to be cured for the obvious reason that it would be useless.

In the case at bar, the appellant continued to treat a number of these addicts, when he knew, according to his own testimony that they did not desire to be cured, that they were getting drugs from other sources in addition to the amount prescribed by him and had secured prescriptions for additional amounts from him on their false statements that they had lost a part of their weekly supply.

The appellant admitted that a better way of securing a favorable result would have been to have required his patients to come to his office at frequent intervals, thereby giving him the power to observe their conditions and control the size of the doses.

His reason for not requiring this of his patients was that some of his patients were poor and that any such requirement would result in his losing his patients. However well founded this fear may have been, it can hardly be urged seriously as a good reason for a failure to apply the method of treatment which was required. In the fall of 1916 the appellant went away on his vacation for a couple of weeks. Before leaving he filled out and signed a number of prescriptions for drugs, leaving a blank for the date in the month to be filled in when the prescription was issued in his absence. These prescriptions were left with a female relative of his wife who was by arrangement to remain in his office and give the prescriptions to his patients if they called for them and who then was to fill in the date on the prescription when delivered. This attendant had no medical training and her only acquaintance with the patients was such as she may

have acquired from having seen them in the office of the doctor at different times for a week or two prior to his departure. That the appellant expected to cure his patients by such a course of procedure is incredible. That he did not expect to cure his patients is made clear by his own testimony, when he was recalled to the witness stand after other witnesses had testified in regard to his method of treatment.

. The appellant then admitted that he did not expect to cure his patients; that the only practical way of effecting a cure would be by placing them under control in some institution and that his object was to give his patients a sufficient supply of the drug to enable them to continue their usual occupations. This particular testimony requires no extended comment. Such treatment for such an avowed purpose is illegal and unprofessional. One of the objects of the Statute, Chapter 178 of the General Laws, 1909, is to prevent drug addicts from securing the desired drug and thereby enabling them to continue the drug habit. The legislature recognized the necessity of making some provision for these unfortunate people and in a proper case the law permitted physicians to prescribe morphine, etc. Such treatment, however, must be in accordance with the recognized practice of medicine, the object of which, in cases wherever it is possible, is to effect a cure.

The procedure followed by the appellant neither cured the patient nor was it adapted to cure him. So long as the patient was able to procure his supply of the drug he would remain a drug addict. The treatment of the appellant was directed principally with the purpose of securing the fees which his patients paid to him in order to secure the desired prescription, and the conclusion from the testimony is irresistible that whatever reductions were made in the amount of the drug prescribed were due more to a desire on the part of the appellant to escape a prosecution for violation of the law than to any expectation on his part of effecting a cure of said patients or of securing for his patients any permanent benefit.

We are of the opinion that the appellant has been guilty of gross unprofessional conduct and of conduct making him an unfit person to practice medicine in this State.

The finding of the State Board of Health revoking the certificate of appellant authorizing him to practice medicine and surgery in this State is affirmed.

*Waterman & Greenlaw*, for appellant.    *Edwin J. Tetlow*, of counsel.

*Fred A. Otis, Third Assistant Attorney General*, for State Board of Health.