---

Ex parte Dame.

Opinion delivered November 19, 1923.

COURTS—JURISDICTION OF SUPREME COURT—WRIT OF HABEAS CORPUS.—
The Supreme Court has no authority to supervise or control the action of courts inferior to the circuit court, except by reaching back through the decisions of the latter court.

Certiorari to Jackson County Court.
Writ denied.
*Pope & Bowers*, for appellant.
*J. S. Utley*, Attorney General, *John L. Carter*, *Wm. T. Hammock* and *Darden Moose*, Assistants, for appellee.

McCulloch, C. J. The petitioner, Ben Dame, was, by the verdict of the coroner's jury in Randolph County, committed to jail on the charge of unlawful homicide, and he presented a petition to the county judge of that county for a writ of habeas corpus for the purpose of inquiring into his right to bail. On the return of the writ the county judge heard the evidence, and made an order denying bail. The petitioner now comes to this court with a petition for certiorari to bring up for review the proceedings before the county judge, and he is met at the outset by the contention of the Attorney General that the writ will not run from this court to the county court, or the judge thereof, and that this court has no jurisdiction to review the action of the county judge or the county court except through a decision of the circuit court.

We are of the opinion that the contention of the Attorney General is correct, and that this court has no jurisdiction in the matter as it now stands. The jurisdiction of this court, except in the single matter mentioned in the Constitution as to quo warranto proceedings, is limited to appellate and supervisory jurisdiction over the inferior courts of law and equity, meaning, of course, the circuit and chancery courts. Art. 7, § 4, Constitution of 1874. The Constitution expressly vests in the circuit courts of the State "a superintending control and appellate jurisdiction over county, probate, court of common pleas and corporation courts and justices of the peace, and shall have power to issue, hear and determine all the necessary writs to carry into effect their general and specific powers." Art 7, § 14. Other sections of the Constitution expressly confer the right of appeal to the circuit court from all such inferior courts. Art. 7, §§ 33-35. In construing these various provisions of the Constitution we have decided that this court has no power to supervise or control the action of courts inferior to the circuit court except by reaching back through the decisions of that court. *Featherstone* v. *Folbre,* 75 Ark. 510; *Jones* v. *Coffin,* 96 Ark. 332.

In *Featherstone* v. *Folbre, supra,* it was said: "Under our judicial system, appeals from all tribunals inferior to the circuit courts go to the circuit courts, and from the circuit courts to this court. This court has no original jurisdiction to control or supervise any proceedings of the probate court. That all belongs to the circuit court as matters of original jurisdiction, and to this court by appellate and supervisory jurisdiction over the circuit courts. This court supervises and controls all courts inferior to the circuit courts only through the latter courts. In no other way can the harmony of our judicial system, as at present constituted, be preserved. Construing the two sections of the Consti-

tution as above quoted, our conclusion is that the framers of the Constitution of 1874 did not intend to confer upon the Supreme Court concurrent jurisdiction with the circuit courts to issue writs of mandamus, etc., in aid of the appellate and supervisory jurisdiction of the circuit courts over inferior courts, but only in aid of its own appellate and supervisory jurisdiction, and its supervisory jurisdiction over the probate courts comes, not originally, but by way of appeal and supervision, through the circuit courts.'' The Constitution provides (art. 7, § 37) that a county judge ''shall have power, in the absence of the circuit judge from the county, to issue, hear and determine writs of habeas corpus, under such regulations and restrictions as shall be provided by law,'' and it is contended by counsel for petitioner that this provision of the Constitution raises the county court to a place of equal dignity with the circuit court, with concurrent jurisdiction in issuing and hearing writs of habeas corpus, and brings it within the range of the appellate and supervisory control of this court. That contention is unsound, for the provision of the Constitution with reference to jurisdiction of a county judge to issue and hear writs of habeas corpus does not change the status or grade of the county court or of the county judge, when acting judicially, nor does it exempt it from the supervisory control of the circuit court. This provision is put into the Constitution as an additional protection to the citizens' right of liberty, but it fits into the Constitution as a part of the harmonious whole and is subject to the other provisions of the Constitution with reference to supervisory control of the various courts.

It is argued with special earnestness that the provision in § 37, art. 7, of the Constitution, conferring power on county judges to issue orders for injunctions and other provisional writs in the absence of circuit judges, subject to review in vacation by the circuit judge, demonstrates that the framers of the Constitution did

not intend to confer authority on circuit courts to review the orders of county judges in issuing, hearing and determining writs of habeas corpus. The obvious purpose was to authorize superior judges to review in vacation the orders of county judges granting injunctions or other provisional writs, so that such orders should not necessarily remain in force until the superior court should convene to review them in term time. The provision has no reference to writs of habeas corpus and does not affect the general authority of a circuit court to exercise superintending control over inferior courts. The authority of the county judges to issue and hear writs of habeas corpus is conferred upon them as a part of their duties as the presiding judge of the court, and the hearing is a judicial act subject to review under the superintending control of the circuit courts.

It is true, as urged by counsel, that courts of equal power and dignity have no power to review or control the decisions of each other, but it does not follow from that axiom that, merely because concurrent jurisdiction is conferred upon two courts, one is divested of jurisdiction to review the decisions of the other. That depends upon the Constitution, which confers the jurisdiction. As an illustration, attention may be called to the fact that our Constitution confers concurrent jurisdiction in certain civil and criminal matters upon justices of the peace and circuit courts, yet the superintending control of the circuit court over justices of the peace is expressly granted. So it is with the jurisdiction of the county judge in the matter of habeas corpus, and, as before stated, the fact that the county court, or county judge in vacation, has jurisdiction in such matters does not exempt the exercise of that jurisdiction from the superintending control of the circuit court.

The jurisdiction of each of the courts in our system is a matter of constitutional control, as each derives its several powers from the Constitution, or, at least, is controlled by constitutional limitation. The writ of

habeas corpus, with all of its ancient sacredness, does not rise above other constitutional provisions regulating the exercise of judicial power. It merely fits into our judicial system, along with other provisions. The reasoning of Mr. Justice Scott, in his dissenting opinion in the case of *Ex parte Hunt,* 10 Ark. 288, which was adopted in the later case of *Carnall* v. *Crawford County,* 11 Ark. 604, and other cases since that date, is applicable.

It is further contended that, even if the circuit court has appellate and supervisory control over the decisions of the county court or county judge in matters of habeas corpus, such control must be exercised by the circuit court, and not by the judge in vacation, and that, as there may be delay in waiting for the circuit court to convene so that the jurisdiction can be exercised, this presents a situation which compels the exercise of superintending control by this court. This contention is not sound, for the reason that the jurisdiction of this court cannot be affected, one way or the other, by the necessary delay in the exercise of the supervisory control by the circuit court of inferior courts and tribunals. The jurisdiction of the county court over habeas corpus is conferred, as we have already said, for the convenience and benefit of persons who are being deprived of their liberty, but, when that jurisdiction is invoked by a person, he must abide by the established provisions with reference to supervisory control over that court. He invokes the exercise of the jurisdiction with its limitations, and the fact that there may be possible delay in the exercise of supervisory control by the circuit court does not enlarge the power of this court. The same argument was made in *Featherstone* v. *Folbre, supra,* and was rejected by this court as unsound. This court has decided in several cases that a hearing on habeas corpus before a judge is the exercise of judicial power, which may be reviewed on certiorari (*Ex parte Jackson,* 45 Ark. 158; *State* v. *Neel,* 48 Ark. 283; *State* v. *Williams,* 97 Ark. 243), but in none of those decisions

is it intimated that this court can exercise a superintending control directly over the proceedings of courts inferior to the circuit court. The effect of the decisions in those cases is merely that the absence of the right of appeal, on account of the fact that the judicial power is exercised in vacation, does not prevent the exercise of superintending control on certiorari, which is thus made, *ex necessitate,* a substitute for appeal, but this does not work any change in the constitutional jurisdiction of the court in the exercise of such supervision. Those decisions, giving full effect to them, still leave the jurisdiction of this court limited to the control and super vision of chancery and circuit courts.

It follows that the petition for certiorari should be denied, and it is so ordered.

WOOD, J., (dissenting). In classifying the rights of persons, next to the right to enjoy life and to have one's body secure from injury, is the right of the personal liberty of individuals. 1 Blackstone's Comm., star pages 128-133. "This personal liberty," says Blackstone, "consists in the power of locomotion, of changing situations, or moving one's person to whatever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law." I Blk. Comm., p. 134, § 2. This liberty of the individual—freedom of the person— is the bedrock of all the highest and best civilizations of the earth. Without it there can be no progress in the arts and sciences, no worthwhile development in government, no health, happiness or prosperity, and life itself would be an unendurable burden. The peculiar form of the writ or instrument, which has been devised and resorted to in times of peace through all the ages since its origin, to preserve this freedom of the person, is known in our law as habeas corpus—technically, "*habeas corpus ad subjiciendum et recipiendum.*" It is a high prerogative writ, a writ of right upon proper application, which existed at the common law independent of statute, and which is issued by a court, judge or tribunal

having authority to issue it, and "directed to the person detaining another, and commanding him to produce the body of the prisoner with the day and cause of capture and detention (*ad faciendum, subjiciendum, et recipiendum*) to do, submit to, and receive, whatsoever the judge, court, or tribunal awarding such writ, should consider in that behalf." 3 Blackstone, Comm. 131. By the common law it issued out of the Court of King's Bench, corresponding to our State courts of last resort, not only in term time, but also *during the vacation*, by a fiat from the Chief Justice or any other of the judges. When issued in vacation, it was usually returnable before the judge himself who awarded it, who proceeded thereon, unless the term intervened, when it was returned into court. 3 Blk. Comm., star page 131; 4 Bacon's Abr. 364.

So important has been this writ to the rights and happiness of individuals in particular and the civilization of mankind in general, commentators on the laws of England and this country have written of it at length. Several law writers have made it the exclusive subject of large volumes; historians and encyclopedists have made it the subject of special themes and given it the extensive treatment its place in history demands. Some of them, seemingly with crusader's zeal, have endeavored to trace the history of the writ to its origin, but, as yet, no one has been able to find it. It is treated by historians and law writers as a *primordial* fact of history, but its origin is hidden in the depths of antiquity. See "Story of Habeas Corpus," 18 Law Quarterly Review, p. 64; 29 C. J., p. 9, § 2. Since the love of freedom is a natural emotion deeply implanted in every sentient intelligent human being, it is safe to say that some peaceful legal method for securing the liberty of the individual, of the same purport as that of our present writ of habeas corpus, must have been coeval with organized society and established government. One writer says: "In the interdict *De libero homine ex habendo* the origin of the English habeas corpus may be traced. Such, in the Roman law, was the name of the writ founded on the

perpetual edict of the praetor: *"Ait praetor: quem liberum dolo malo retines exhibeas*—the praetor declares: Produce the freeman whom you unlawfully detain." This edict was compiled and is found in the Pandects of Justinian, and the comments of the celebrated Roman lawyers thereon show that the application of the edict and the writ involved the same principles as in our *habeas corpus ad subjiciendum* of the English law, and the latter most probably was therefore borrowed from the civil law. *Lane v. Cotton,* 12 Mod. R. 482; *Acton v. Blundell,* 12 Mceson & Welsby, 353; *Bechervaise v. Lewis,* L. R. 7 Common Pleas 372; *Agnew v. Belfast Banking Co.,* 2 Irish Reports 204, collated in Howe's Studies of the Civil Law, p. 128-129.

Glanvil, Coke and Blackstone all mention ancient writs which were in existence long before Magna Charta for liberating persons who had been unjustly imprisoned on criminal charges. Church on Habeas Corpus, p. 3, § 3; Coke's Institutes, 3rd Part, p. 209; 4th Part, p. 182; 2 Blk. Comm., star pp. 128-129. Mr. Blackstone says: "The great charter of liberties which was obtained, sword in hand, from King John, and afterwards, with some alteration, confirmed in Parliament by King Henry Third, his son, contained very few new grants, but, as Sir Edward Coke observes, was for the most part declaratory of the principal grounds of the fundamental laws of England." "The Great Charter," he says, "was afterwards confirmed by the statute of the 25th of Edward I and directed to be allowed as the common law, and sentence of excommunication was directed to be denounced against all those that by word, deed, or counsel act contrary thereto, or in any degree infringe it." I Blk. Comm., star pp. 127-129.

The 36th chapter of the Great Charter provides: "Nothing shall be given or taken for the future for the writ of inquisition of life or limb; but it shall be given without charge, and not denied."

The 39th chapter of the Great Charter declares: "No freeman's body shall be taken, nor imprisoned, nor

disseised, nor outlawed, nor banished, nor in any way be damaged, nor shall the King send him to prison by force, excepting by the legal judgment of his peers, and by the laws of the land." And chapter 40 declares: "To none will we sell, to none will we deny, to none will we delay right or justice." These declarations of the Great Charter were intended to conserve personal liberty, to protect the person of the individual against illegal imprisonment. They contained the most rigorous restraint upon arbitrary power that the world hitherto had known; they furnished the germ of that individual liberty protected by law which henceforth was to be the archetype for all written constitutions, especially of the English-speaking race, preserving the liberty of the individual and the freedom of the person against illegal restraint of every character and from the encroachments of arbitrary power in government. These declarations do not expressly mention the ancient writs, *"de odio et atia," "de homine replegiando,"* spoken of by Glanvil, Coke and Blackstone, but they were intended to preserve and enlarge to Englishmen for all time all the rights that had obtained under these ancient writs, and more. *One of the most sacred of these rights was to prevent any person remaining in prison until the arrival of the justices in Eyre, when he should be tried.* See Richard Thompson's Essay on Magna Charta, p. 218. Therefore the above declarations of the Great Charter, it would seem, were sufficient of themselves, if duly enforced, to have forever guaranteed the personal liberty of Englishmen.

However, notwithstanding the Great Charter had been declared and put in force as the common law, and had been confirmed and enlarged in other charters, notably by those of Henry III and Edward I, and although it was corroborated by a multitude of subsequent statutes, which Sir Edward Coke reckons at thirty-two from the first Edward to Henry IV (2 Inst. Proem.), nevertheless the royal prerogative was still bold and strong. It continued so throughout the reigns of the

Plantagenets, the Tudors and the Stuarts. During this long period there was a constant struggle to advance arbitrary power in defiance of the rights and liberties secured to the people of England by the Great Charter. Although the charter of liberties was declared to be the common law, and had not been repealed, nevertheless a tribunal called the Star Chamber flourished, which did not proceed according to the common law. * This tribunal dispensed with trial by jury, proceeded on rumor, applied any torture, and inflicted any punishment short of death. It, with the "high commissioner" and the "privy council," were powerful auxiliaries of cruel and rapacious rulers to force the nobility, the gentry and the yeomanry alike to bow in servile obedience to the will of the crown. The cruel and unusual punishments, horrible tortures, excessive fines, and outrageous exactions inflicted and imposed, often without any opposition from, and with the warrant of, the judges themselves, during the reigns of such tyrannical rulers as Henry VII, Henry VIII, and Bloody Mary, of the Tudors, and James I, Charles I, Charles II, and James II of the Stuarts, finally brought forth from Parliament the Petition of Right of Charles I, the Habeas Corpus Act of Charles II, and the Bill of Rights of James II. These were indeed all fresh charters of liberty, and the most famous was the Habeas Corpus Act of the 31st of Charles II, which, Macaulay says, was "the most stringent curb that ever legislation imposed on tyranny." 2 Macaulay, Hist. England, 3.

Such is the history of the writ of habeas corpus, so far as it is necessary to trace it in England, an account of which may be found in any of the standard English histories, such as Hallam's Const. History, Hume, Macaulay, and Green. This history, as we shall now

---

*There needed but this one court in any government to put an end to all regular, legal, and exact plans of liberty, for who durst set himself in opposition to the crown and ministry, or aspire to the character of being a patron of freedom, while exposed to so arbitrary a jurisdiction. 2 Hume, 119.

see, enters into the very warp and woof of the fabric of the jurisprudence of our own country and judicial system. A knowledge of this history is absolutely necessary to the proper construction of our own Constitution and statutes concerning habeas corpus.

Our forefathers inherited all the ancient rights and liberties that had been guaranteed to Englishmen under the free Constitution of Great Britain, as declared in Magna Charta, the Petition of Right, and the Bill of Rights, which three, Lord Chatham, the great commoner of that day, pronounced the "Bible of the English Constitution." These were declaratory of, and intended to secure, personal rights which the freemen of Great Britain contended were a part of their birthright under the common law long before Magna Charta. In these great documents our ancestors, the American colonists, found the prototype for their Declaration of Independence from the mother country, and, after it had been achieved by Revolution, for the Constitution of the United States. "It was," says Judge Story, "under the consciousness of the full possession of the rights, liberties and immunities of British subjects, that the colonists, in almost all the early legislation of their respective assemblies, insisted upon a declaratory act acknowledging and confirming them." 1 Story's Const., § 165; Hurd on Habeas Corpus, chp. 5; *Ex parte Yerger,* 8 Wallace 85-95. See *Ex parte Holman,* 28 Ia. 125; *People ex rel. Tweed* v. *Liscombe,* 60 N. Y. 559; also "Magna Charta in America," 17 Columbia Law Review, p. 1; "Origin of Magna Charta," 1 Canada Law Journal, pp. 202-5.

The Constitution of the United States and of all the States of the Union recognize the privilege of the writ of habeas corpus as one which every person in the United States is entitled to as a co-heir of all the rights, liberties and immunities of the free and natural-born subjects of Great Britain, as those rights were declared and enforced under the free constitution of that realm. The right of personal liberty, after Magna Charta, was ever a favorite object of the English law, and the most celebrated of the

numerous acts of Parliament which were intended to protect and preserve that liberty is the statute of the 31st of Charles II, "which," Blackstone says, "is frequently considered as another Magna Charta of the Kingdom." 3 Blackstone, Comm., star p. 136. Mr. Hurd quotes an elegant philosophical writer as saying of the Habeas Corpus Act of the 31st of Chas. II, "we must admire it as the keystone of civil liberty, the statute which forces the secrets of every prison to be revealed, the cause of every commitment to be declared, and the person of the accused to be produced, that he may claim his enlargement, or his trial *within a limited time.* No wiser form was ever opposed to the abuses of power." Hurd on Habeas Corpus, 99.

Mr. Hallam says before the enactment of this Habeas Corpus Act "it was also a question whether a single judge of the Court of King's Bench could *issue the writ in vacation.* The statute therefore enacts that, where any person other than persons convicted, or in execution upon legal process, stands committed for any crime except for treason or felony plainly expressed in the warrant of commitment, he may, *during the vacation,* complain to the chancellor, or any of the twelve judges, who, upon sight of a copy of the warrant, or an affidavit that the warrant has been denied, shall award a habeas corpus." 3 Hallam's Const. Hist., p. 20. Hume says, "the Great Charter had laid the foundation for this valuable part of liberty; the Petition of Right had renewed and extended it, but some provisions were still wanting to render it complete and prevent *all evasion or delay from ministers and judges.*" 2 Hume's Hist. of England, 568. Those provisions were supplied by the Habeas Corpus Act, which has as *its dominant note the issuance of the writ in vacation.* "Every prisoner," says Green, "committed for any crime, save treason or forgery, was declared entitled to his writ, even *in the vacations of the court,* and heavy penalties were enforced on judges or jailers who refused him this right." 2 Green's England, p. 431.

"The Habeas Corpus Act," the statute of the 31st of Charles II, says Chancellor Kent, "restored the writ of habeas corpus to all the efficacy to which it was entitled at common law and which was requisite for the due protection of the liberty of the subject. That statute has been reenacted or adopted, if not in terms, yet in substance and effect, in all the United States.   *  *.  *   The substance of the provisions on the subject of the writ of habeas corpus may be found in the statute of the 31st of Chas. II, chp. 2, which is the basis of all the American statutes on the subject." 2 Kent's Comm., p. 9, 43-44. Our habeas corpus act, as found in the Revised Statutes, p. 433 (ch. 79, Crawford & Moses' Digest), is referred to in a note to Judge Kent's text as being modeled after the statute of 31st of Chas. II. That statute, among other things, provides that it shall be the duty of any court of record, or the judge of any court of record, *in vacation,* to issue the writ of habeas corpus whenever "there is evidence, from any judicial proceeding had before them, that such person is illegally confined or restrained of his liberty within the jurisdiction of such court or judge." Sections 7 and 9, ch. 73, Revised Statutes, and §§ 5084 and 5090, Crawford & Moses' Digest.

The provisions of our Habeas Corpus Act, *supra,* were a part of the laws of the Territory of Arkansas, and were brought into the Revised Statutes of the State soon after the State was admitted into the Union under an act for a revision of the statute laws of the State, approved Oct. 6, 1836, which statutes, as revised, were adopted by the General Assembly of the State in the year 1837. In the Constitutions of the State of 1836, 1861, 1864 and 1868, it is expressly declared that "the privilege of the writ of habeas corpus shall not be suspended unless when, in cases of rebellion or invasion, the public safety will require," and the provision of our present Constitution is that "the privilege of the writ of habeas corpus shall not be suspended except by the General Assembly in case of rebellion, insurrection or invasion, as the public safety may require it." Article 2, § 11. Our

present Constitution also contains the following provision: "In the absence of the circuit judge from the county, the county judge shall have power to issue orders for injunctions and other provisional writs in their counties, returnable to the court having jurisdiction, provided that either party may have such order reviewed by any superior judge in vacation in such manner as shall be provided by law. The county judge shall have power, in the absence of the circuit judge from the county, to issue, hear and determine writs of habeas corpus under such regulations and restrictions as shall be provided by law." Article 7, § 37.

All the constitutions adopted from 1836 to 1874, inclusive, contained the following provisions: "The Supreme Court, except in cases otherwise provided by this Constitution, shall have appellate jurisdiction only, which shall be coextensive with the State, under such restrictions as may from time to time be prescribed by law. It shall have a general superintending control over all inferior courts of law and equity; and, in aid of its appellate and supervisory judisdiction, it shall have power to issue writs of error and supersedeas, certiorari, habeas corpus, prohibition, mandamus, and quo warranto, and other remedial writs, and to hear and determine the same. Its judges shall be conservators of the peace throughout the State, and shall severally have power to issue any of the aforesaid writs." Article 7, § 4, Const. of 1874.

Now, some of the members of the Convention of 1874 which framed our present Constitution were very able lawyers. They were familiar with the provisions of prior constitutions and with the provisions of the habeas corpus act as contained in the Revised Statutes, and, as some of them also were learned men and students of history, they had a thorough knowledge of the history of the writ of habeas corpus as I have traced it above and of the common law and statutes of Great Britain providing for the privileges of this writ and for their enlargement and enforcement. Having this history in mind, it

cannot be doubted that the framers of our present Constitution intended by the various provisions concerning the writ of habeas corpus, to which I have referred, to give this writ a unique and distinctive place in our jurisprudence and judicial system. They intended to give it that preeminent place commensurate with its glorious history in the civilization of mankind. For arbitrary power in government and personal liberty—the freedom of the person—have always been "deadly foes, ever at dagger's point in endless feud," and this great writ of right, through all the centuries, has been, in times of peace, the the most powerful instrument in the hands of the individual to thwart the will of cruel and despotic rulers in their efforts to repress and restrain personal freedom. It is the constitutional bulwark erected by the Anglo-Saxon race to protect the individual against illegal imprisonment and to guarantee the liberty of his person against unlawful restraint of every character.

Keeping in mind the history of this writ, as it comes to us from the remotest antiquity and as it obtained under the common law, and as it has been enforced since Magna Charta under the acts of Parliament in Great Britain for hundreds of years, especially since the enactment of what is known as the Habeas Corpus Act of the 31st of Chas. II, ch. 2, *supra,* I have not the slightest doubt that it was the intention of the framers of our organic law, Federal and State, to make it impossible in this country for an individual to be unlawfully restrained of his liberty for any longer time than is absolutely necessary to apply to some court, *or some judge in vacation,* having jurisdiction, for the writ of habeas corpus to have the cause of his imprisonment inquired into. It would be a travesty upon our jurisprudence and a reproach to our judicial system if it were otherwise. But it is not.

The purpose of the framers of our Constitution in article 7, § 37, *supra,* is to give the county judge precisely the same jurisdiction, in the absence of the circuit judge from the county, to issue, hear, and determine the

writ of habeas corpus, that the circuit judge has. In the absence of the circuit judge from the county, the county judge takes his place. He is, for the purpose named, in the absence of the circuit judge, a circuit judge in jurisdiction, and his order in the judicial proceeding before him is not to be reviewed by the circuit court or judge, but is to be reviewed by the only tribunal that has appellate and supervisory jurisdiction over the circuit court and circuit judge, to-wit, the Supreme Court, or one or more of its judges in vacation, in aid of the appellate jurisdiction of the Supreme Court.

According to the express language of article 7, § 37, *supra,* a county judge, in the absence of the circuit judge from the county, has the power to issue orders for injunctions and other provisional writs in their counties, returnable to the court having jurisdiction of those writs, and the order issuing such provisional writs (such as injunction, mandamus, etc), may be reviewed by any superior judge in vacation in such manner as may be provided by law. But not so with the order of the county judge, acting in the absence of the circuit judge, in the writ of habeas corpus proceeding. The orders of the county judge in habeas corpus proceedings, in the absence of the circuit judge, are not subject to review by the circuit judge or circuit court for the very reason that, for this time and this purpose, he is, by the Constitution, substituted for the circuit judge. He is *ad hoc* the circuit judge, with the same judicial power as the circuit judge, and there is no judge or court above him except the Supreme Court or the judges thereof. The statute, § 5084, C. & M. Digest, was passed in conformity with art. 7, § 37 of the Constitution, *supra,* and gives the county judge jurisdiction ''coextensive with his county, in the absence of the circuit judge therefrom, to issue, hear and determine writs of habeas corpus on proper application of parties entitled thereto, in all cases *and with like powers* in which the circuit judge may issue and determine such writ.'' When the county judge has exercised these powers, under the Constitution and stat-

ute, his final order in the proceeding must be reviewed by the same method and in the same manner that the order of the circuit judge is reviewed, which manner and method are pointed out in *Ex parte Hart,* 39 Ark. 126; *Ex parte Goode,* 19 Ark. 410; *Ex parte Kittrell,* 20 Ark. 499; *Ex parte Jackson,* 45 Ark. 158; *State ex rel. Ark. Industrial Co.* v. *Neal,* 48 Ark. 283; *State ex rel. Attorney General* v. *Williams,* 97 Ark. 243.

It is quite certain that, if the framers of the Constitution had intended to give the circuit judge or the circuit court the power to review the order of the county judge in habeas corpus proceedings, in the absence of the circuit judge from the county, they would have expressly granted such jurisdiction to the circuit court, or circuit judge in vacation, just as they did in cases of injunctions and other provisional writs. The fact that they did not do so shows that it was their intention that the county judge, acting in the absence of the circuit judge from the county, in issuing, hearing and determining writs of habeas corpus, should be substituted for the circuit judge, and that his order in the proceeding should be subject to review only as the circuit judge's order could be reviewed. *Expressio unius est exclusio alterius* applies.

This court has often ruled that proceedings in habeas corpus before a circuit judge or chancellor at chambers is judicial, and subject to review by the Supreme Court on certiorari issued by this court, to bring up the record of such proceedings. *Ex parte Jackson,* 45 Ark. 158; *State* v. *Neal,* 48 Ark. 283; *State ex rel.* v. *Williams,* 97 Ark. 243, and cases there cited.

It is said in the majority opinion that the obvious purpose of § 27, art. 7, of the Constitution, conferring power on county judges to issue orders for injunctions and other provisional writs, in the absence of circuit judges, subject to review in vacation by circuit judges, "was to authorize superior judges to review in vacation the orders of county judges granting injunctions or other provisional writs, so that such orders should not neces-

sarily remain in force until the superior court should convene to review them in term time; but that there is no such authority, under the above constitutional provision, for reviewing habeas corpus proceedings before a county judge in the absence of a circuit judge, except by the circuit court. In other words, it is argued that habeas corpus proceedings before a county judge, in the absence of the circuit judge from the county, cannot be reviewed by the Supreme Court, nor even by a circuit judge or chancellor in vacation, but can only be reviewed by the circuit court. Such a construction gives these injunctions, and the other provisional writs which have reference merely to the protection of property rights, a greater importance and higher dignity, under our judicial system, than the writ of habeas corpus, which protects and preserves the freedom of the person—the personal liberty of the individual. It is unbelievable that the framers of our Constitution would have provided a method for reviewing the vacation orders of county judges granting injunctions or other provisional writs for the protection of property rights, in order that the same might not remain in force and the rights of property delayed until the superior court could review them in term time, and yet not have made some provision for the review of the orders of county judges in habeas corpus proceedings in order that the sacred rights of personal liberty might not be delayed until a superior court should convene to review them. In the minds of the framers of our Constitution, personal freedom—the liberty of the person— was of far greater importance than all other personal or property rights. Next to life itself, the right of personal liberty is sacrosanct; and the framers of the Constitution, instead of making the writ of habeas corpus, which is intended to preserve and protect the liberty of the person, subordinate and inferior to injunctions and other provisional writs designed to protect mere propety rights, have exalted it to a preeminent place, as we have seen, in our judicial system. In view of its ancient origin, its glorious history, and its sacred purpose to

preserve the personal liberty of individuals against illegal imprisonment, the framers of our Constitution intended, in art. 7, § 37, *supra,* that orders of the county judge, in the absence of the circuit judge from the county, in habeas corpus proceedings, should be reviewed by this court in the same manner as such proceedings by the circuit judge or chancellor in vacation are reviewed. The framers of the Constitution conferred upon county judges the power, in the absence of circuit judges from the county, to issue, hear, and determine writs of habeas corpus, under such regulations and restrictions as shall be provided by law. The framers of our habeas corpus act in conformity with both the spirit and letter of the Constitution, provided that "the county judge shall have power coextensive with his county, in the absence of the circuit judge therefrom, to issue, hear, and determine writs of habeas corpus, on proper application of parties entitled thereto, in all cases and with like powers in which the circuit judge may issue and determine such writs." Section 5084, C. & M. Digest. Writs of habeas corpus may be issued by a circuit judge in vacation, and his order may be reviewed by this court. Likewise, writs of habeas corpus may be issued by county judges, in the absence of circuit judges from the county, with like powers in which the circuit judge may issue and determine such writs, and the orders of the county judges in such cases are also reviewable by this court. Were it otherwise, it would be entirely possible to illegally imprison an individual, who was justly entitled to his liberty, for many days, and even months, awaiting a term of the circuit court, before the orders of the county judge refusing to allow him bail could be reviewed.

To illustrate: In most of the circuit courts of the State there is a period of at least six months between the terms of court. Section 2207, C. & M. Digest. The circuit judge, during vacation, is usually not present in any of the counties in the circuit except that one in which he resides. If one who is illegally imprisoned should apply to a county judge for writ of habeas corpus, and

the county judge, after hearing the writ, should make an order refusing to discharge him or to grant him bail, then the prisoner, under the construction which the majority has given the Constitution and habeas corpus act, would have to remain in prison until the circuit court convened before the order of the county judge could be reviewed. In such case the unfortunate victim of the erroneous order of the county judge would be unlawfully deprived of his liberty during all this time. If the county judge remanded him, and he should thereafter apply for a second writ to a circuit judge or chancellor, and it appeared that he had been once remanded for an offense not bailable, he would have to be again remanded without further proceedings. Section 5083, C. & M. Digest. In the language of Judge EAKIN, speaking for the court in *Ex parte Jackson,* 45 Ark. 158, at page 161 : ''It would be a disgrace to any government if the decision of such matters were left to the arbitrary will of one man, without appeal or means of correction.''

With all due deference, it occurs to me that it is a deplorable misapprehension of our Constitution and habeas corpus act to so construe them as to make possible such results as I have indicated. I feel sure that such was not the intention of our lawmakers in framing our Constitution and habeas corpus act. There is certainly nothing in the language of either to justify such construction. Such an interpretation, instead of preserving the harmony of our judicial system, absolutely destroys it and thwarts the will, both of the framers of the Constitution and habeas corpus act, which were intended by them to embody in enduring form the sacred privileges of the writ of habeas corpus, and the procedure under it, which obtained in England hundreds of years before our forefathers transplanted them into the organic law of this great republic under the all-embracing provision, ''The privilege of the writ of habeas corpus shall not be suspended unless when, in cases of rebellion or invasion, the public safety may require it.''

In reaching my conclusion I have not overlooked those decisions of our court to the effect that the Supreme Court has no power to supervise and control the action of courts inferior to the circuit court except by reaching back through the decisions of that court. I am well aware of the decisions of our court to the effect that, "under our judicial system, appeals from all tribunals inferior to the circuit courts go to the circuit courts, and from the circuit courts to this court;" and that "this court has no original jurisdiction to control or supervise any proceedings of courts inferior to the circuit courts, except through the circuit courts." See *Featherstone* v. *Folbre*, 75 Ark. 510; *Jones* v. *Coffin*, 96 Ark. 332-336. It was my lot to express the opinion of the court in those cases. The court did not have under consideration article 7, § 37, of the Constitution and our habeas corpus act, *supra*, and I did not consciously express anything in those cases that has the remotest connection, even by analogy, to the question now under consideration. Those cases are cited as authority for the argument made in the opinion of the majority to the effect that the county judge, in the absence of the circuit judge from the county, in issuing, hearing and determining habeas corpus proceedings under the Constitution and habeas corpus act, is an inferior court to the circuit judge or circuit court, and hence the decision of the county judge in such proceedings can only be reviewed by the circuit court. This argument begs the question, is based upon a false premise, and is wholly unsound. It assumes that the jurisdiction conferred upon the county judge under the Constitution and habeas corpus act is but the exercise of similar or equal jurisdiction as that of the county court, that the county judge, in habeas corpus proceedings, is as the county court. Such is not the case at all, as I have shown. The county court has no jurisdiction in habeas corpus proceedings. The framers of the Constitution could have vested this same judicial power in some other officer or tribunal than the county judge, and, if they had done so, could it be said that the

jurisdiction thus conferred was inferior to the jurisdiction conferred upon the circuit judge in habeas corpus proceedings? Certainly not. The jurisdiction conferred upon the county judge, under the above provision of the Constitution, is concurrent and equal in dignity to the jurisdiction of the circuit judge. In exercising this jurisdiction he is not the county court at all, but the specially designated tribunal to meet the exigencies of the situation caused by the absence of the circuit judge from the county and to prevent the delay that might be incident to waiting his return or in applying to other tribunals having power to issue the writ. If I am correct in my conclusion that the jurisdiction of the county judge under the Constitution and habeas corpus act is not inferior to, but the same as, that of the circuit judge, and that it was the intention to substitute him for the circuit judge in the absence of the latter from the county, then it is obvious that the doctrine of *Featherstone* v. *Folbre* and *Jones* v. *Coffin* have not the slightest application to the question. Certainly nothing that was said in the opinions in those cases conflicts with the views I am now expressing.

I am also aware of the decision of this court in *Carr* v. *State*, 93 Ark. 585. In that case Carr was accused of, arrested, and imprisoned for murder in the first degree. He applied to Judge Lea, during vacation, for bail, which was refused. He then applied to me during vacation of the Supreme Court, for certiorari to bring up the record before the circuit judge, and a writ of habeas corpus to admit him to bail until the Supreme Court, in term time, could review the action of the circuit judge denying him bail. Acting under what I conceived to be the power of the judges of the Supreme Court under art. 7, § 4, *supra*, I issued the writ of habeas corpus, and, on reviewing the record of the proceedings before Judge Lea, I was of the opinion that the prisoner was clearly entitled to bail, making my decision in the premises returnable to the Supreme Court for its review. The court held that I, as an associate justice, had no jurisdiction in the

premises, and that my action in admitting the prisoner to temporary bail until the decision of the Supreme Court could be had was of no authority or effect. I dissented in that case, and have always regretted that I did not write out my dissent. I am still dissenting. For it is my firm conviction that article 7, § 4, of the Constitution, conferring upon the judges of this court power to issue writs of habeas corpus in aid of the appellate and supervisory jurisdiction of the Supreme Court, was intended to cover just such cases as that presented to me as associate justice in the Carr case. It is well known that at that time the vacations of the Supreme Court lasted for a period of three months, and if·an associate justice did not have the power to issue the writ of habeas corpus in aid of the appellate jurisdiction of the Supreme Court, and to admit to bail the prisoner until the order of the circuit judge in vacation could be reviewed by the highest court, then Carr, who, in my opinion, was justly entitled to bail (and who was afterwards either acquitted or convicted of only a lower grade of homicide than murder in the first degree), would have been compelled to remain in unlawful imprisonment until the vacation of the Supreme Court was over. If a judge of this court could not, in vacation, issue a writ of habeas corpus and admit to bail a prisoner who was entitled thereto, under the above circumstances, then the provision of art. 7, § 4, of the Constitution is rendered absolutely nugatory. The writ of habeas corpus is a writ whose only function is to inquire into the illegal imprisonment of a person, and if a judge of this court could not issue such a writ, under the above circumstances, then it could never be issued at all, for he has no original jurisdiction to issue it, and the constitutional provision would thus be wholly without effect.

By statute, § 1432, C. & M. Digest, the common law of England, so far as the same is applicable and of a general nature, not local to that Kingdom and not inconsistent with the Constitution and the laws of this State, shall be the rule of decision in this State. By act of

Parliament, as we have seen, Magna Charta was to be allowed as the common law.   Mr. Hurd, in his excellent work on Habeas Corpus, pages 102 and 103, tells us that, about the year 1757, a bill was pending in the House of Lords to extend the power of granting writs of habeas corpus to all judges of His Majesty's courts *in vacation time,* in all cases not within the statute of the 31st of Chas. II.   Lord Mansfield, he says, "spoke two and a half hours on the bill, and said, among other things, that 'the writ of habeas corpus at common law was a sufficient remedy against all those abuses the bill was supposed to . rectify.' "   A majority of judges of England, during the pendency of the bill, declared in favor of the exercise of the powers, regardless of the passage of the bill.   The judges of the King's Bench, after the passage of the habeas corpus act, were accustomed to issue the writ, during the vacation, in all cases whatsoever.   Lord Denman, Chief Justice of the Queen's Bench, in *Watson's Case,* 36 Com. L. Rep. at p. 261, shows that at that time the practice had prevailed for the judges to issue the writs *in vacation* for at least one hundred and sixty years.

We have the common law; we have Magna Charta; we have the Constitution of the United States; we have our own Constitution  and our habeas corpus act—all recognizing and guaranteeing the privileges of the writ of habeas corpus to preserve and protect the liberty of the person against illegal imprisonment, with all the liberal procedure thereunder.   With all these safeguards, as practiced in Great Britain for centuries, "to procure and complete to every individual that sense of independence which is the noblest advantage attending personal liberty," it is indeed unfortunate that our court should have so construed our Constitution and habeas corpus act as to make it possible for one to be unlawfully restrained of his liberty for a longer period than is absolutely required to make proper application to some judge or tribunal given, under our Constitution and laws, the jurisdiction to issue, hear and determine writs of habeas corpus.

My conclusion of the whole matter is that, under our Constitution and habeas corpus act, any one unlawfully deprived of his personal liberty may apply to the circuit judge or chancellor in vacation, and, in the absence of the circuit judge from the county, to the county judge, before indictment; and if any of these judges deny him the liberty to which he believes himself entitled, he may appeal directly from their decision to the Supreme Court, and, if the Supreme Court is in vacation, he may apply to one or more of its judges for certiorari and habeas corpus in aid of the appellate jurisdiction of the Supreme Court, to be granted bail, if entitled thereto, until the Supreme Court can review the ruling of the judge refusing him bail.   Such was the doctrine intended to be announced in _State ex rel. Attorney General_ v. _Williams, supra,_ where we said: "This court has jurisdiction to review the proceedings of inferior courts and of judges and chancellors at chambers, upon application for writs of habeas corpus, and to review, revise and correct the action of the inferior court or judge. * * * Where there is no subordinate court competent to issue the writ, the Supreme Court will award it, as held in _Ex parte Robins, supra._   Thus it will be seen our law guards carefully the rights of the accused throughout, and provides an orderly administration of justice; the chancellors and judges named in the habeas corpus act to issue writs and grant bail in accordance with its terms, except after indictment for capital offenses not expressly made bailable; after such indictment the circuit court wherein the same is pending, or the judge thereof in vacation, to grant bail without interference from any other court or judge, with the Supreme Court over all to review, revise and correct the action of the lower court or judge, and grant relief itself where, because of unavoidable accident or casualty, no inferior court is competent to do so." See also _State ex rel._ v. _Neal, supra._

If the Constitution and habeas corpus act be so construed, it makes a perfect system, complete and harmonious in every detail, relating to habeas corpus, which

is not in conflict with any other part of our judicial system. But the construction of the majority leaves a break in our judicial system and harks back, it seems to me, to those dark and cruel days when, by the word of the despot and the decree of the Star Chamber, men were thrown in jail and allowed to linger for months, and even years, because the King's judges suspended the sacred privileges of the writ of habeas corpus. 2 Hallam's Constitutional History, p. 39 *et seq.* 44; 3 Hallam's, p. 18; 3 Blk. Comm., star p. 136.

Mr. Justice HUMPHREYS authorizes me to say that he concurs fully in the above opinion.